Nélida Ríos Ruiz, su esposo Alcides Pagán y la Socie-
dad Legal de Bienes Gananciales, compuesta por
ambos, demandantes y recurridos, *v.* Dr. Anthony
Mark, su esposa Johanna Doe, la Sociedad Legal de
Bienes Gananciales, compuesta por ambos, y John
Doe Insurance Company, demandados y recurrentes.

*Número:* RE-86-212      *Resuelto:* 7 de diciembre de 1987

*Alfredo Cruz Resto,* abogado de los recurrentes; *Víctor A. Vélez Cardona,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Dr. Anthony Mark recurre ante nos y cuestiona la sentencia del Tribunal Superior que concluyó que fue negligente en el tratamiento ofrecido a la Sra. Nélida Ríos Ruiz. Examinada la prueba pericial y documental revocamos al tribunal de instancia y concluimos que no se probó que el doctor Mark fuera negligente al recetar un medicamento aceptado en la práctica de la oftalmología para evitar la recurrencia de una lesión en el ojo.

## I

El 31 de enero de 1984 los demandantes presentaron una acción de daños y perjuicios contra el doctor Mark por impericia médica en la intervención quirúrgica y tratamiento de la señora Ríos Ruiz. Dicho galeno extirpó por segunda vez un tejido, pterigión, que tenía la paciente sobre el ojo derecho. En esencia se trata de un crecimiento de la conjuntiva del ojo hacia la córnea.

Los demandantes alegaron originalmente que la señora Ríos Ruiz había sufrido un cambio en la pigmentación alrededor del ojo, fenómeno que se denomina técnicamente como vitíligo, debido a que la operación se efectuó con luz solar en un día en que ocurrió un apagón eléctrico, amén del trato violento que recibió la codemandante. Posteriormente los demandantes enmendaron su teoría, según expuesta en el Informe sobre Conferencia Preliminar, a fin de alegar que el demandado, al prescribir el fármaco *Thiotepa*, no orientó a su paciente ni le exigió que se hiciera un contaje semanal de células blancas y de plaquetas. Como consecuencia, sufrió la decoloración del área alrededor del ojo a que hemos hecho referencia.

Luego de oír los testimonios de los demandantes y los peritos de ambas partes, el Tribunal Superior (Sala de Utuado) concluyó que "[l]a lesión sufrida por la Sra. Nélida Ríos [Ruiz] se debió al uso de [*Thiotepa*] y por lo tanto, fue mal indicado por el Dr. Anthony Mark...". Sentencia de 10 de diciembre de 1985, pág. 6. Fundamentó su determinación en que el *Thiotepa*, según el *Physicians' Desk Reference*, no es usado en ningún tipo de enfermedad oftálmica. También afirmó que el doctor Mark fue "imprudente y falto de delicade[z]a en el tratamiento de la [señora] Ríos". Íd., pág. 14.

La controversia central, tanto en instancia como ante este foro, es si el doctor Mark se apartó de las normas mé-

dicas prevalecientes en el tratamiento ofrecido a la demandante, al recetarle el medicamento *Thiotepa* para evitar la recurrencia de su enfermedad ocular.

En vista de que las determinaciones sobre impericia médica del tribunal a quo están fundamentadas en la prueba pericial y documental ofrecida, este Tribunal está en igual posición para evaluarla y llegar a sus propias conclusiones. *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Velázquez* v. *Ponce Asphalt*, 113 D.P.R. 39 (1982).

## II

La norma mínima de cuidado médico exigible legalmente en casos de impericia en Puerto Rico, al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es aquella atención que a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisfacen las exigencias generalmente reconocidas por la profesión. *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978); *González* v. *E.L.A.*, 104 D.P.R. 55 (1975); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *Oliveros* v. *Abréu*, 101 D.P.R. 209, 226 (1973); *Cruz* v. *Centro Médico de P. R.*, supra. Nuestro ordenamiento obliga al médico a responder por los daños y perjuicios causados tan sólo cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias. Véase Brau, *Los daños y perjuicios extracontractuales en Puerto Rico*, Publicaciones J.T.S., Inc., 1986, Vol. I, págs. 248–294. Ahora bien, al médico se le reconoce una amplia discreción en el cuidado de un paciente. No incurre en responsabilidad el médico que ante las circunstancias particulares usa su buen juicio profesional, enmarcado en los límites de lo razonable y aceptable para

muchos sectores de la profesión médica. *Lozada* v. *E.L.A.*, 116 D.P.R. 202 (1985). Por lo tanto, un error de juicio honesto y razonable en el diagnóstico o el tratamiento constituye un eximente de responsabilidad cuando las autoridades médicas están en desacuerdo sobre cuál es la cura adecuada.

■ Aunque compete a los tribunales determinar en cada caso individual si la actuación médica cumple con las normas profesionales, no es nuestra función prescribir tratamientos médicos. "Comprendemos que cada paciente puede presentar circunstancias particulares que hagan que un tratamiento específico sea o no sea recomendable. También reconocemos que toda cura médica conlleva cierto tipo de riesgo de alguna clase. Por esta razón hemos reconocido la necesidad de que los médicos hagan uso de su criterio profesional informado enriquecido con la experiencia y la madurez —en la doctrina de que un error honesto de juicio no genera responsabilidad." (Escolio omitido.) *Cruz* v. *Centro Médico de P.R.*, supra, pág. 736.

■ Igualmente, en ausencia de prueba en contrario "[e]xiste la presunción, a favor del médico, de que éste utilizó y administró el tratamiento adecuado [al] paciente ... no surgiendo presunción alguna de negligencia del hecho de que el paciente haya sufrido daño o de que su tratamiento no haya tenido éxito". *Rivera* v. *Dunscombe*, 73 D.P.R. 819, 838 (1952). Corresponde al demandante probar, mediante preponderancia de la prueba, que el tratamiento ofrecido por el demandado fue el factor que con mayor probabilidad ocasionó el daño, y establecer además el vínculo causal requerido por el Art. 1802 del Código Civil, *supra*. *Cruz* v. *Centro Médico de P.R.*, supra.

■ Al cumplir con nuestra función revisora en casos de impericia médica, nuestra decisión debe estar

fundada en la prueba vertida en el juicio por los peritos y la prueba documental. En ausencia de prueba no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil, *supra*. De lo contrario, cedemos a la tentación de sustituir el criterio de los peritos médicos por el nuestro, según un estudio apelativo de la literatura disponible.

### III

La primera controversia ante nuestra consideración es si el doctor Mark actuó negligentemente al recetarle a la señora Ríos Ruiz el medicamento *Thiotepa* (*Triethylene Thiophosphoramide*) de los Laboratorios Lederle. Un examen cuidadoso de los autos originales, la exposición narrativa de la prueba y los alegatos de ambas partes revelan que la prueba no apoya la conclusión de negligencia del tribunal a quo. Todo lo contrario, del testimonio pericial y la literatura médica disponible se desprende que la aplicación de *Thiotepa* es un tratamiento comúnmente utilizado en la oftalmología para evitar la recurrencia del pterigión.

En su testimonio ante el tribunal de instancia el doctor Walter Kleis, perito en oftalmología y coautor de estudios sobre el *Thiotepa*, explicó que por su localización geográfica y la exposición de Puerto Rico a la intensa radiación solar, los oftalmólogos atienden muchos casos de pterigión. Para reducir la recurrencia de esta dolencia, la práctica prevaleciente entre oftalmólogos es aplicar radiación Beta o el medicamento *Thiotepa*. En su extensa exposición en el juicio, el doctor Kleis afirmó que esa medicina "tiene como ventaja que está ampliamente disponible en Puerto Rico y no es cara [como la radiación Beta]". Según el doctor Kleis el "[*Thiotepa*] evita el recrecimiento de los vasos sanguíneos [y] la proliferación de células a través de vasos sanguíneos. Actúa en esa forma porque es un agente radiomimético,

tiene la característica especial de actuar sobre el tejido nuevo". E.N.P., pág. 16.

En cuanto al uso oftálmico del medicamento, el perito explicó que los oftalmólogos usan el *Thiotepa* en una dosis muy diluida cuando el tejido está fresco o recién operado y es particularmente efectivo sobre células o vasos sanguíneos nuevos.[1] La dosis de gotas recetada a la demandante es la que se acostumbra usar en estos casos. Por todas estas razones el doctor Kleis concluyó que "[e]l usar [*Thiotepa*] en un paciente que ha sido operado por segunda vez con motivo de un pterigión es una norma de buena práctica en oftalmología". E.N.P., pág. 17.

La literatura médica sobre el pterigión confirma la conclusión del doctor Kleis. Por ejemplo, el profesor Havener, en el texto básico de farmacología ocular, informa que el *Thiotepa* es efectivo para evitar la recurrencia del pterigión y que adecuadamente diluido no tiene efectos adversos sobre el paciente:

> Corneal vascularization can be inhibited by topical application of antimitotic chemicals. Triethylenethiophosphoramide (thio-tepa) is a nitrogen mustard derivative that will selectively inhibit rapidly growing normal or neoplastic tissues.... Unfortunately new vessel growth began again as soon as inhibitor therapy was stopped, and the ultimate condition of the cornea was not greatly benefited by this treatment.
>
> Recurrence of pterygium has been prevented by instillation of a 1:2000 solution (15 mg in 30 ml of Ringer's solution) of thio-tepa every 3 hours (while awake). Instillations were started 2 days postoperatively and were continued for 6 weeks. *No adverse effects* on the eye resulted from this concentration and frequency of use. In a series of 19 patients

---

[1] La dosis del medicamento, en su aplicación oftálmica mediante gotas, es diluida en comparación con la que se aplica en los casos del cáncer en la vejiga urinaria, en que se administra a través de una sonda que se introduce dentro de ese órgano.

so treated, no recurrence was encountered. No rebound
vascularization occurred after thio-tepa was discontinued.
(Énfasis nuestro.) Havener, *Ocular Pharmacology*, 5ta ed.,
C.V. Mosby Co., 1983, pág. 240.[2]

En Puerto Rico el uso del *Thiotepa* para tratar el
pterigión es tan generalizado que en 1973 los doctores
Walter Kleis y Guillermo Picó prepararon un abarcador
estudio sobre este tema y concluyeron que era efectivo para
evitar la recurrencia postoperativa del pterigión y que no
era peligroso para los pacientes:

The effectiveness of Thio-tepa solution and recurrence rates
after operation for pterygiums was studied in 48 cases treated
by this agent. . . . No adverse effects of any kind were noted.
The recurrence rate fell from 31.8% in the control cases to
8.3% in the cases treated with Thio-tepa. . . . It was concluded
on the basis of this study, that Thio-tepa is a safe and effective
agent for use in attempts to reduce the recurrence rates after
operation for pterygium. Kleis & Picó, *Thio-tepa Therapy to*

---

[2] El doctor J. Cassady estudió el uso oftálmico del *Thiotepa* para pacientes
con pterigión y concluyó lo siguiente:

"Thiotepa is inexpensive, non-irritating, free of side effects, readily available
and simple to use. It is hoped that its use will eliminate the necessity of employing
the more complicated surgical procedures for recurrent pterigiums ... thiotepa
seems to be more effective than beta irradiation in preventing recurrence of
pterygiums, although it appears to be necessary to continue its use for at least eight
weeks post operatively. . . . If this simple treatment continues to be as effective as it
has been in the three series reviewed here, it would appear that recurrence of
pterygiums can be almost completely eliminated." J. Cassady, *The Inhibition of
Pterygium Recurrence by Thio-tepa*, 61 Am. J. Ophth. 887 (1966). Véanse también:
M.E. Langham, *The inhibition of corneal vascularization by triethylene
thiophosphoromide*, 49 Am. J. Ophth. 111 (1960); E. Asregadoo, *Surgery, Thio-tepa,
and Corticosteroid in the Treatment of Pterygium*, 74 Am. J. Ophth. 960; Berkow,
Gills and Wise, *Depigmentation of Eyelids After Topically Administered Thiotepa*,
82 Arch. Ophthal 415 (Sept. 1969); Howitt and Karp, *Side Effect of Topical Thio-
tepa*, 68 Am. J. Ophth. 473; Rock, *Inhibition of Corneal Vascularization by
Triethylene Thiophosphoramide* (Thio-tepa), 69 Arch. Ophth. 330; Meacham,
*Triethylene Thiophosphoramide in the Prevention of Pterygium Recurrence*, 54 Am.
J. Ophth. 751; Hornblass, Adler, Vukcevich and Gombos, *A Delayed Side Effect of
Topical Thiotepa*, Ann. Ophth. (November 1974); Olander, Haik & Haik,
*Management of Pterygia: Should Thiotepa be Used*, Ann. Ophth. 853 (1978).

*Prevent Postoperative Occurrence and Neovascularization,* 76(3) Am. J. Ophth. 371 (1973).

Tampoco se probó mediante prueba pericial o documental que la decoloración de la señora Ríos Ruiz fuera causada por la aplicación o el efecto acumulativo del *Thiotepa*. El único dermatólogo que testificó fue el Dr. Jorge Sánchez, quien confirmó el testimonio del doctor Kleis y opinó que no existía relación entre el uso del *Thiotepa* y la condición de la demandante. Señaló que en su clínica de vitíligo ha tratado a cientos de pacientes y "[n]inguno de los casos ha sido provocado por el [*Thiotepa*]". E.N.P., pág. 21. Señaló que según la localización de la lesión, su morfología y por el hecho de que no había inflamación ni trauma en el área, su condición era de vitíligo. Afirmó que la lesión no fue causada por el medicamento. Su testimonio avalado por su extensa experiencia, precisamente con pacientes de vitíligo, es convincente.[3]

■ Contra esta abundante literatura médica sobre la aplicación oftálmica de este medicamento y los testimonios de dos peritos con extensa experiencia investigativa en las lesiones sufridas por la señora Ríos Ruiz, los demandantes utilizaron un doctor de medicina deportiva sin estudios especializados en oftalmología ni en dermatología. Su testimonio no demostró el dominio de la oftalmología que se requería en este tipo de caso. De hecho, admitió que refería a los pacientes de pterigión a oftalmólogos y que sus conocimientos en dermatología estaban limitados al curso básico que tomó mientras estudiaba medicina.

---

[3] Aunque el profesor Havener informó sobre casos aislados de despigmentación, concluyó que posiblemente esto era debido a un fenómeno de fotosensibilidad, resultado de la exposición a la luz solar mientras se está bajo tratamiento de *Thiotepa*.

El testimonio del doctor de la parte demandante se limitó a informar que el *Thiotepa* se usa para tratar el cáncer en la vejiga urinaria. Sin embargo, por su desconocimiento de la oftalmología no pudo explicar su aplicación oftálmica. Tampoco aclaró cuáles eran las normas médicas prevalecientes sobre la atención adecuada para corregir la lesión del pterigión y evitar su recurrencia.

Tampoco la parte demandante ofreció prueba documental que apoyara sus alegaciones de impericia médica. Basado en el testimonio de que el *Physicians' Desk Reference* no indicaba que el *Thiotepa* tenía uso oftalmológico, el tribunal de instancia concluyó que el doctor Mark había sido negligente.

Este dictamen está apuntalado en el supuesto de que un médico incurre en responsabilidad por el "uso no indicado de la droga". Sin embargo, ni la Ley federal de Drogas y Alimentos ni la doctrina vigente imponen responsabilidad absoluta al médico que aplica una medicina a un uso no indicado:

> . . . The absence of an indication in the package insert does not mean that the use of the drug in a given case was improper *per se*. What it does mean is that the manufacturer has not filed an appropriate supplement to the NDA supported by "substantial evidence" to secure approval for the indication of the drug's use in the treatment of such a condition. H. Hardin, *Esq., The Role of the Package Insert in Malpractice and Products Liability Litigation,* Medicolegal, 1979, National Symposium, pág. 76.

Todo lo contrario, la Administración federal de Drogas y Alimentos entiende que un médico tiene entera discreción para utilizar su juicio clínico en la aplicación de medicamentos, aun en situaciones no indicadas por el fabricante. Por supuesto, debe actuar conforme a las normas médicas prevalecientes:

"Once the new drug is in the pharmacy, the physician may, as a part of the practice of medicine, lawfully prescribe a different dosage for his patient, or may otherwise vary the conditions of use from those approved in the package insert, without informing or obtaining [the] approval of the [F]ood and [D]rug [A]dministration." FDA Drug Bulletin, Oct. 1972, citado en Hardin, *op. cit.*, pág. 76.

■ Este criterio, de que una vez un medicamento es aprobado por la Administración federal de Drogas y Alimentos un médico está en libertad de aplicarlo para usos no indicados, prevalece en casi todas las jurisdicciones en Estados Unidos. Por eso el editor del *Physicians' Desk Reference* categóricamente afirma que los usos indicados en su publicación no excluyen otras aplicaciones de las medicinas:

Under the Federal Food, Drug & Cosmetic (FD&C) Act, a drug approved for marketing may be labeled, promoted, and advertised by the manufacturer only for those uses for which the drug's safety and effectiveness have been established and which the FDA approved....

The FDA has also announced that the FD&C Act "does not, however, limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling." Thus, the FDA states also that "accepted medical practice" often includes drug use that is not reflected in approved drug labeling. E. Barnhart, ed., *Physicians' Desk Reference*, 40ma ed., Prólogo, 1986.

■ En otras palabras, para evaluar si en determinado caso un médico es negligente al prescribir una medicina, hay que referirse a las normas profesionales prevalecientes en ese momento para la atención de pacientes con la enfermedad o lesión tratada.

Si algo se probó en instancia fue que el doctor Mark actuó correctamente al recetar *Thiotepa* en la dosis

recomendada por las obras en farmacología oftálmica, tratándose de la recurrencia postoperativa del pterigión en una paciente que previamente había sido operada.

■ Los médicos no tienen la obligación de impartir a sus pacientes un curso completo de medicina y de farmacología cada vez que recetan un medicamento. Tienen el deber de suministrar al paciente suficiente información sobre la naturaleza del tratamiento, los riesgos implicados y los beneficios que se esperan. Aunque hay diversidad de criterios sobre el alcance y el contenido del deber de divulgación, Rozovsky, *Consent to Treatment*, Boston-Toronto, Little, Brown and Co., 1984, págs. 51–56, hay consenso sobre que no hay que divulgar riesgos remotos que han ocurrido en pocas ocasiones y que no es probable que le ocurran a ese paciente en particular. J.E. Britain, *Product Honesty is the Best Policy: A Comparison of Doctor's and Manufacturers' Duty to Disclose Drug Risks and the Importance of Consumer Expectations in Determining Product Defect*, 79 Nw. U.L. Rev. 342 (1984); M. Zierk, *Informed Consent Doctrine Does Not Require a Physician to Disclose Negligible Risks of a Proposed Therapy*, XX Suffolk U.L. Rev. 165 (1986).

En este caso particular, los testimonios periciales claramente probaron no solamente que el *Thiotepa* tenía uso oftálmico, sino que la dosis aplicada no implicaba riesgos significativos que debían ser informados al paciente. Estos testimonios están sólidamente respaldados por la literatura médica disponible.

■ Por otro lado, de la exposición narrativa de la prueba no se desprende que los demandantes demostraran, mediante prueba pericial, que los oftalmólogos acostumbren informarle a sus pacientes del riesgo de despigmentación causada por el medicamento en casos aislados. En ausencia

de esta prueba, no le corresponde al foro apelativo introducir criterios científicos que los demandados se ven imposibilitados de rebatir y contrarrestar ante este Foro, para convalidar la determinación de negligencia del tribunal de instancia.

De la anterior discusión concluimos que la parte demandante no ofreció la prueba documental necesaria para apoyar sus alegaciones de impericia médica.

Procede, por lo tanto, *que se dicte sentencia que revoque la del Tribunal Superior, Sala de Utuado*.

La Juez Asociada Señora Naveira de Rodón emitió un voto particular. El Juez Asociado Señor Negrón García disiente con opinión escrita.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Sin pretenciones de profeta, auguramos que este recurso inicia un cambio doctrinario por este Foro apelativo en la evaluación de casos de mala práctica médica, representativo del predominio de normas laxas frente a las de excelencia médica. Ello no satisface nuestra conciencia judicial. Primero, injustificadamente se dejan sin efecto las determinaciones de hecho del foro de instancia y se descarta la existencia de una comprobada relación causal. Segundo, el Tribunal se aparta del tradicional análisis jurídico de que son objeto estos casos, y la evaluación separada y crítica que presupone todo testimonio pericial a la luz de los textos básicos reconocidos y de fácil acceso en la medicina. *Valldejuli Rodríguez* v. *A.A.A.*, 99 D.P.R. 917, 923–924 (1971); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Fernández* v. *Hosp. Gen. San Carlos, Inc.*, 113 D.P.R. 761,

767 (1983); *Crespo* v. *H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 802-806 (1983); *Núñez* v. *Cintrón*, 115 D.P.R. 598, 606-609, 618 (1984); *Pérez Cruz* v. *Hosp. La Concepción*, 115 D.P.R. 721, 731, 735-736 (1984); *Lozada* v. *E.L.A.*, 116 D.P.R. 202, 209-210 (1985).

Esta visión del papel del Tribunal, aunque pretenda negarse, implica una renuncia a la función judicial de examinar y aquilatar el valor probatorio de la prueba pericial desfilada —*López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 204 (1978)— en particular los conflictos entre autoridades opuestas sobre controversias periciales médicas. *Cruz* v. *Centro Médico de P.R.*, supra, pág. 721.

Exponemos estas observaciones, "sin ánimo aleccionador, convencidos de que el genuino juez no necesita ser aleccionado sobre la justicia, sino que éste es un sentimiento que le brota del corazón, que le permitirá, afinando aquí la letra de la ley, suavizándola allá, modelar con el barro de la norma inadecuada una resolución justa, siempre con la humilde convicción de que 'el juicio de cada cual viene de Yahvé'". (Escolios omitidos.) C. Ma. Entrena Klett, *La equidad y el arte de juzgar*, Pamplona, Ed. Aranzadi, 1979, págs. 88-89.

Por ser injusto el dictamen, rechazamos vehementemente esa renuncia a la función judicial. Máxime si se abren las puertas al uso indiscriminado de medicinas sin la formulación de guías apropiadas y se desatiende la orientación médica y jurídica en casos de este género. La prueba abrumadoramente revela que el Dr. Anthony Mark incurrió en serias omisiones profesionales y es responsable por éstas. Desde este distante Foro apelativo no hemos debido desatender tales actuaciones; tampoco toda la evidencia documental demostrativa de los casos informados en los anales de la medicina sobre el peligro potencial en la piel por el uso oftalmológico del *Thiotepa*.

Adelantamos que curiosamente los Laboratorios Lederle, fabricantes de este fármaco, nunca han autorizado su distribución o promovido su uso para fines oftalmológicos. Aun así, nuestro disenso no cierra los campos terapéuticos de la medicina. Sólo intenta hacer un balance entre la terapia médica y los pacientes, sin debilitar el mejoramiento profesional médico a través de la educación y lectura continua. Lamentablemente el Tribunal nos ha dado las espaldas.

Hechas estas aclaraciones, concentremos en el recurso. Específicamente versa sobre la etapa en que "[u]na vez el médico en el ejercicio de su juicio clínico elige recetar o administrar una droga terapéutica en el tratamiento de un paciente, surge sólo la interrogante en cuanto a la responsabilidad del médico por lesiones del paciente que estén relacionadas con la droga. La responsabilidad del médico para con el paciente puede caer en una o varias de las siguientes categorías: (a) uso no indicado de la droga; (b) desviación de las recomendaciones de uso del fabricante insertas en el paquete, y (c) no haber obtenido el adecuado consentimiento del paciente. . . ." (Traducción nuestra.) H. Hardin, *Esq.*, *The Role of the Package Insert in Malpractice and Products Liability Litigation*, Medicolegal, 1979, National Symposium, pág. 75.

## I

El 28 de septiembre de 1981, Nélida Ríos Ruiz, casada con Alcides Pagán, fue intervenida quirúrgicamente por el doctor Mark para la remoción de un pterigión[1] en su ojo

---

[1] Por su alta incidencia, esta condición se asocia con los habitantes que viven en las latitudes del trópico o subtrópico, o aquellas personas que trabajan en el exterior o en ambientes de alto nivel de polvo. En la mayoría de los casos, se cree que la luz ultravioleta es un agente incitante. D. Ehrlich, *Pterygium & Pseudopterygium*, compilado en Fraunfelder & Roy, *Current Ocular Therapy*, W. B. Saunder Co., 1980, pág. 353.

derecho. Pterigión es el término oftalmológico que describe el tejido conectado fibrovascular, triangular que sobrecrece de la conjuntiva hacia la córnea. T. D. Duane, *Clinical Ophthalmology*, Philadelphia, Harper & Row, 1986, Vol. 4, pág. 49. Tiene un color rojizo y causa irritación y molestia. Si es grande debe extirparse quirúrgicamente. A raíz de la operación, el doctor Mark le recetó el fármaco *Thiotepa* diluido en una ampoyeta en 30 cc de Lactado de Ringer a ser aplicado en gotas. Además le recetó Vasocidín, también en gotas. Aun así, a las dos semanas volvió a salirle el tejido. Tras varias visitas, el doctor Mark le informó que el pterigión era recurrente y había que operarla otra vez.

La segunda intervención se hizo el 17 de marzo de 1983. Fue realizada bajo anestesia local en el consultorio del galeno en una camilla cerca de la ventana. *No había luz eléctrica debido a un apagón ocurrido horas antes.* Nuevamente el médico Mark le recetó *Thiotepa* a ser aplicado a razón de una gota en el ojo operado cuatro veces al día. También ordenó las gotas de Vasocidín. La paciente adquirió el *Thiotepa* en la Farmacia Walgreen's el mismo día y siguió el tratamiento. El 19 de marzo de 1983 regresó a una cita para el examen del ojo y limpieza del área esclerar. Subsiguientemente estuvo en el consultorio el 26 de marzo y el 18 de junio de 1983. En esta última visita el doctor Mark anotó que la paciente había desarrollado vitíligo en el párpado debajo del ojo derecho, causado — según le informó a la demandante un dermatólogo— por el medicamento. Hizo constar que el pterigión estaba activo. En la cita de 7 de julio, el galeno consignó que la paciente había "adquirido alguna pigmentación y usaba Vasocidín". En vista de que ella seguía mal, el doctor Mark le aconsejó una tercera operación. La Sra. Nélida Ríos Ruiz la rehusó.

El 23 de febrero de 1984, conjuntamente con su esposo Alcides Pagán, presentó demanda contra el doctor Mark en el Tribunal Superior, Sala de Utuado, por mala práctica

profesional. Reclamaron en daños las sumas de $50,000 y $10,000, respectivamente. El galeno Mark contestó y negó responsabilidad. Tal y como quedó enmendada la demanda en la conferencia con antelación al juicio, la negligencia que se le imputó fue prescribir el fármaco *Thiotepa* sin adecuada orientación, y no requerir un contaje semanal de células blancas y de plaquetas para saber su efecto tóxico, si alguno. Se adujo que ello fue la "causa primaria y/o concurrente de la decoloración sufrida por la demandante".

Previo los trámites de rigor, dicho foro dictó sentencia y condenó al demandado doctor Mark a satisfacer el pago de dichas cantidades. A solicitud de éste revisamos. En síntesis, cuestiona que el foro de instancia haya determinado relación causal entre el tratamiento con *Thiotepa* y la despigmentación, su negligencia y la cuantía de daños.(2)

## II

No hay controversia de que la demandante Ríos Ruiz tiene una lesión hipocrómica sobre y en el párpado superior del ojo derecho; además en todo el párpado inferior derecho que se extiende una pulgada debajo del reborde de las pestañas. La descripción [d]ermatológica de la lesión por el foro de instancia es una "dermatosis constitu[í]da por zona

---

(2) Específicamente, como errores señala: (1) la determinación de "que el uso del [*Thiotepa*] causa aberraciones Cromosómicas de tipo cromatídico, o sea, una irregularidad en el número o constitución de los cromosomas que produce imagen borrosa y dispersión de los colores"; (2) la existencia de relación causal; (3) la apreciación de la prueba documental sobre la omisión en el *Physicians' Desk Reference* (P.D.R.) del uso del *Thiotepa* en la oftalmología y la interpretación del récord médico y apuntes del Doctor Mark; (4) la conclusión de negligencia; (5) que una biopsia hubiese despejado la duda sobre si la condición fue ocasionada por dicho medicamento; (6) de la fijación de la cuantía de los daños, y (7) imponerle honorarios de abogado.

Algunos de estos señalamientos más bien son argumentos en apoyo de los errores centrales sobre relación causal, negligencia y compensación.

a[c]rómica rodeada de márgenes hipercrómicos. El centro de la lesión es totalmente hipocrómic[o] con pestañas canas o albínicas que contrastan con las pestañas normales del ojo izquierdo. Esta lesión se clasifica como Leucodermia adquirida o Hipopigmentación localizada iatrogénica, o sea, que resulta de la actividad de los médicos. Dicha lesión es de tipo irreversible y de evolución crónica y requerirá de maquillaje cosmetológico de por vida para simulación parcial de la lesión". Sentencia de 10 de diciembre de 1985, pág. 7.

El medicamento *Thiotepa* (*Triethylene Thiophosphoramide*), producido por los Laboratorios Lederle en Puerto Rico, según la literatura del fabricante contenida en el *Physicians' Desk Reference* (P.D.R.),[3] esencialmente es un "agente citotóxico del tipo alcalino polifuncional (más de una reacción en grupo etilemínico), química y farmacológicamente relacionado con la mostaza nitrogenada. Se cree que su acción radiomimética ocurre al liberar radicales estilemínicos que, al igual que la radiación, rompen los enlaces de DNA". Como compuesto químico se emplea en el tratamiento de varias enfermedades cancerosas neoplásticas (tumores malignos). Es altamente tóxico al sistema hematopoyético. "Mientras se use se recomienda un contaje semanal de células blancas y plaquetas y por lo menos, durante tres semanas después de concluido el

---

[3] La obra *Physicians' Desk Reference* (P.D.R.) es una fuente práctica de información que se usa cotidianamente como referencia inmediata. La publica la *Medical Economic Co. Inc.* "Su función es compilar, organizar y distribuir esta información. La descripción de cada producto ha sido preparada por el fabricante, y editada y aprobada por su departamento médico, director médico y/o consultor médico." (Traducción nuestra.) *Physicians' Desk Reference*, 37 ed., 1983 (Preámbulo). La información advierte, además, de los riesgos y efectos nocivos de cada medicamento según informados.

Cada seis (6) meses se envía un suplemento a los doctores y demás suscriptores en que se actualiza la información y se figuran los nuevos medicamentos disponibles, uso correcto y manera en que deben ser administrados. Se advierte, además, cuáles han sido descontinuados. Íd.

tratamiento. Un descenso rápido en el contaje de células blancas y de plaquetas indica que hay que suprimir el medicamento. *Thiotepa es un agente alcalino polifuncional capaz de cruzar y unir el DNA de la célula y cambiar su naturaleza. La replicación celular es alterada, y por lo tanto Thiotepa se puede clasificar como mutagénico.* Un estudio *in vitro* ha demostrado que [*Thiotepa*] causa aberraciones cromosómicas del tipo cromatídico y la frecuencia de las aberraciones inducidas aumentan con la edad del sujeto. Como todo agente alcalino [*Thiotepa*] es carcinogénico...." (Traducción nuestra y énfasis suplido.) *Physicians' Desk Reference, op. cit.,* págs. 1030–1031.

Respecto a su uso oftalmológico, el P.D.R. nada nos dice. Ciertamente, en su origen no fue así concebido por sus fabricantes ni autorizado por la Administración federal de Drogas y Alimentos (Administración federal). Esta agencia tiene la misión primaria de velar por la "seguridad, concentración, calidad, pureza y veracidad de los reclamos sobre eficiencia y utilidad de las drogas". (Traducción nuestra.) *Lawyers' Medical Cyclopedia,* 3ra ed., Indianapolis, Allen Smith Co., 1981, Vol. I, pág. 350. "Antes de ponerse en el comercio, las nuevas drogas deben ser examinadas adecuadamente, tanto por el fabricante siguiendo las especificaciones de la Administración federal, como por ésta." (Traducción nuestra.) Íd., pág. 350.

Este proceso de control forma parte de la protección que se intenta dar. "Antes de aprobarse para el consumo humano la Administración federal de Drogas y Alimentos exige que se realicen estudios intensivos y con animales, e investigaciones científicas clínicas responsablemente controladas. Durante una etapa la droga se suministra por investigadores debidamente adiestrados y cualificados a ciertos pacientes que han dado su consentimiento. El proceso investigativo se lleva a cabo siguiendo un estricto protocolo para determinar, entre otros, la toxicidad, la

absorción del metabolismo, su eliminación, ruta de administración, niveles de dosis de seguridad, calendario de dosis óptimas, efectividad y seguridad en el diagnóstico, y tratamiento y profilaxis del grupo de pacientes. Una vez demostrado con *evidencia sustancial* la eficacia de la droga, entonces se autoriza para el mercado." (Traducción nuestra.) Hardin, *op. cit.*, pág. 71.

Aclaramos que ninguna droga aprobada por la Administración federal está exenta de reacciones adversas. "El progreso médico ha traído avances dramáticos en los métodos de diagnósticos y tratamiento, pero con cada adelanto, siguen informes de reacciones adversas a drogas. La ocurrencia de reacciones ocasionales, más que evidencia de tratamiento médico impropio, está considerado como un peligro casi predecible y de costumbre. La razón para esto es que las nuevas drogas se abren al mercado a base de información limitada. Antes de autorizarse, la droga está sujeta a intensos estudios químicos, farmacológicos, bioquímicos y toxilógicos bajo el escrutinio de la Administración federal de Drogas y Alimentos. El curso de conducta de la droga se estudia bajo varias situaciones experimentales. Durante la investigación del uso, ciertos efectos reproducibles se documentan, pero la investigación envuelve un número limitado de pacientes. Usualmente, 500–2,000 pacientes reciben la droga para estudios clínicos, y frecuentemente sólo unos pocos la reciben entre tres a seis meses. Por lo tanto, no todos los efectos importantes pueden descubrirse o son completamente evaluados antes de que la droga sea autorizada para uso de la práctica en general." (Traducción nuestra.) *Lawyers' Medical Cyclopedia, op. cit.*, pág. 355. "Por estas razones, las reacciones adversas ocurren, y se complican por las reacciones o idiosincracia individual. Otro factor es la interacción de las drogas." Íd., pág. 356. Como ha afirmado el Tribunal Supremo federal, "[p]ocas drogas son totalmente seguras, en sentido de que

pueden ser tomadas por todas las personas en todas circunstancias. Por ende el Administrador generalmente considera una droga segura cuando sus ganancias terapéuticas contempladas justifican los riesgos que genera su uso". (Traducción nuestra y escolios omitidos.) *United States* v. *Rutherford*, 442 U.S. 544, 555 (1979).

Ahora bien, la propia Administración federal ha aclarado que el Congreso no tuvo la intención de regular por su conducto la práctica de la medicina. 37 Fed. Reg. 16, 503 (1972). El estatuto, 21 U.S.C. sec. 301 *et seq.*, no "limita la manera en que un médico puede usar una droga aprobada. Una vez aprobada para el comercio, el médico puede recetarla para usos o regímenes de tratamiento o población de pacientes no incluidos en su etiqueta de aprobación". (Traducción nuestra.) K.B. Brilhart, *The Food, Drug & Cosmetic Act and Its Influence on Medical Malpractice,* Leg. Med. Annual 334–339 (1973); H. Turkel, *The Physician's Right To Prescribe,* Med. Trial Tech. Q. 221 *et seq.* (1967). También dicha agencia asevera que la práctica médica aceptada incluye de vez en cuando el uso de drogas no reflejado en la etiqueta de su aprobación. "Ha tratado de mantener la libertad de recetar del médico al hacer claro que el recetar fuera de la etiqueta algunas veces está completamente justificado y no debe ser visto como necesariamente impropio." (Traducción nuestra.) R. M. Cooper, *Drug Labeling and Products Liability: The Role of the Food and Drug Administration,* 41 Food Drug Cosm. L.J. 233, 234 (1986).

### III

En el caso de autos el demandado Mark probó, y así lo corrobora la literatura, que desde hace más de una década el *Thiotepa* se utiliza, con relativo éxito, para evitar el problema de la recurrencia del pterigión. "La recurrencia

probablemente es un proceso de inflamación aguda resultante de la formación de tejido granular que se contrae y empuja la conjuntiva dentro de la córnea. Esta respuesta en sí media en la formación de un verdadero nuevo *pterygium*, que usualmente es más agresivo que la lesión original. El *pterygium* secundario puede ocurrir hasta en el 30 por ciento de los casos después de su remoción quirúrgica." (Traducción nuestra.) D. Ehrlich, *Pterygium & Pseudopterygium*, compilado en Fraunfelder & Roy, *Current Ocular Therapy*, W. B. Saunder Co., 1980, pág. 353.

Específicamente atestiguó, como perito, el oftalmólogo Walter Kleis, quien atestó que ha recetado en innumerables ocasiones el fármaco *Thiotepa*. La práctica tuvo su génesis en algunos estudios realizados en varios países, que demostraron que la droga ayuda a algunos pacientes a evitar la recurrencia del pterigión. M.E. Langham, *The Inhibition of Corneal Vascularization by Triethylene Thiophosphoramide*, 49 Am. J. Ophth. 1111 (1960); C. T. Meacham, *Triethylene Thiophosphoramide in the Prevention of Pterygium Recurrence*, 54 Am. J. Ophth. 751 (1962); R.L. Rock, *Inhibition of Corneal Vascularization by Tri-ethylene Thiophosphoramide (Thio-TEPA)*, 69 Arch. Ophth. 330 (1963); J.R. Cassady, *The Inhibition of Pterygium Recurrence by Thio-TEPA*, 61 Am. J. Ophth. 886 (1966); B.S. Liddy y J.F. Morgan, *Triethylene Thiophosphoramide (Thio-TEPA) and Pterygium*, 61 Am. J. Ophth. 888 (1966); G.A. Joselson y P. Muller, *Incidence of Pterygium Recurrence in Patients Treated with Thio-TEPA*, 61 Am. J. Ophth. 891 (1966).

Este interés terapéutico por el *Thiotepa* en la especialidad de la oftalmología se originó en 1960 cuando Langham, *op. cit.*, demostró que su aplicación diluida retardaba el proceso de vascularización en los ojos de los conejos. La base era que el fármaco tenía la habilidad de inhibir la proliferación rápida de las células como agente

antitumor. Otros estudios clínicos confirmaron su uso en seres humanos y "enfatizaron lo seguro y pocos efectos tóxicos del tratamiento con el *Thiotepa,* en contraste con las complicaciones tardías de la radiación Beta...". (Traducción nuestra.) D. M. Robertson y P. J. Creasman, 73 Am. J. Ophth. (1972).

En particular el testigo doctor Kleis hizo referencia a un estudio efectuado por él en Puerto Rico, coautorizado por el Dr. Guillermo Picó, financiado por los Laboratorios Lederle denominado *Thio-Tepa Therapy to Prevent Postoperative Pterygium Ocurrence and Neovascularization.* Sus resultados aparecen publicados en 76(3) Am. J. Ophth. 371–372 (1973). Se estableció que el *Thiotepa* inhibía la recurrencia del pterigión en algunos pacientes.

No obstante éste y otros estudios análogos, lo cierto es que hasta el presente, el uso de *Thiotepa* en la oftalmología no ha sido indicado por su fabricante Laboratorios Lederle ni incluido en el *Physicians' Desk Reference.* Tampoco la Administración federal de Drogas y Alimentos oficialmente lo ha sancionado.

En consecuencia, resolvemos que el fármaco *Thiotepa,* desde su primer uso en seres humanos por el doctor Measham en 1962, comenzó a utilizarse con algún éxito moderado para evitar la recurrencia de pterigión quirúrgicamente removido. Su uso, per se, está permitido en la oftalmología, con sujeción al cuidado, las advertencias médicas de rigor que la buena práctica de la medicina exige en medicamentos de este género, y el consentimiento del paciente.

## IV

De igual modo concluimos que la lesión sufrida por la Sra. Nélida Ríos Ruiz se debió al uso de *Thiotepa.* La etiqueta de los Laboratorios Lederle, según reproducida en

el *Physicians' Desk Reference*, claramente demuestra que este fármaco penetra la célula y cambia su naturaleza. Es de carácter mutagénico, e *in vitro* (en tubos de ensayo u otros medios experimentales que no envuelven animales o seres humanos), ha causado irregularidades en la constitución y el número de cromosomas. Las células de la piel están sujetas a esta mutación. Más aún, desde 1969, la literatura médica en la especialidad de la oftalmología comenzó a informar y alertar de otros estudios en que ocurrieron, entre sus efectos nocivos secundarios, casos de despigmentación permanente de la piel asociados con este tipo de tratamiento. D. Howitt y E.J. Karp, *Side-effect of Topical Thio-TEPA*, 68 Am. J. Ophth. 473 (1969); J.W. Berkow, J.P. Gills, Jr. y J.B. Wise, *Depigmentation of Eyelids After Topically Administered Thiotepa*, 82 Arch. Ophth. 415 (1969); W. H. Havener, *Ocular Pharmacology*, The C.V. Mosby Co., 1978, págs. 200–201; K. Olander, K. Haik y G. Haik, *Management of Pterygia: Should Thiotepa be Used*, Ann. Ophth. 853 (1978); Ehrlich, *op. cit.*, pág. 355. Incluso se ha informado de casos a largo plazo de efectos inaceptables. A. Hornblass, R. Adler, W.M. Vukcevich y G.M. Gombos, *A Delayed Side Effect of Topical Thiotepa*, 6 Ann. Ophth., 1155 (1974). A tal efecto, cautelarmente el Dr. Edward R. Asregadoo, en su artículo *Surgery, Thio-Tepa, and Corticosteroid in the Treatment of Pterygium*, 74 Am. J. Ophth. 960, 963 (1972), exponía de casos aislados de despigmentación y prevenía a sus colegas que para "evitar estas complicaciones debe advertirse a los pacientes, en particular los individuos trigueños y obscuros, contra bañarse en el sol durante la terapia. También que con un paño húmedo deben limpiarse toda medicación que se escape hacia la piel de los párpados".

Aun así, el demandado doctor Mark negó causalidad y trató de establecer que la despigmentación de la piel era

debido a un vitíligo.(4) No tuvo éxito. Coincidimos con el foro de instancia. Además, para fines decisorios es inmaterial si es vitíligo. Aun bajo este supuesto ello no le favorece, pues el origen de esa enfermedad es desconocido. ¿Puede entonces afirmarse que no lo causó el *Thiotepa*? Independientemente de la controversia sobre el nombre científico de la despigmentación que sufriera la señora Ríos Ruiz —o la clasificación que merezca en la especialidad de dermatología—(5) es un hecho irrefutable que ello le ocurrió y manifestó *después*, cuando por segunda ocasión, el doctor Mark le recetó el *Thiotepa*. La decoloración en sí fue localizada. En términos de probabilidades son demasiadas las coincidencias para atribuírselas a factores de suerte ajenos al tratamiento. Después de todo, ante los tribunales, en casos de impericia médica la comprobación jurídica de un hecho no se funda en la ciencia exacta matemática, sino en la conciencia del juzgador apuntalada sobre cuáles son

---

(4) Vitíligo (Leoucodermia). Se define generalmente como la "[p]érdida del pigmento, generalmente en áreas de piel netamente delimitadas. Pueden observarse placas aisladas o numerosas, rara vez de pigmentación de todo el cuerpo". (Traducción nuestra.) *El Manual de Merck*, 3ra ed., Merck, Sharp & Dohme, 1964, pág. 789. Su origen es desconocido. Se atribuye un alto porcentaje al componente hereditario. Se manifiesta como pérdida de la pigmentación, en forma de parchos. (Testimonio del Dr. Jorge Sánchez, subespecialista en dermatología patológica, E.N.P., pág. 20.) "El proceso esencial en el vitíligo es la destrucción de los melanocitos." (Traducción nuestra.) W.F. Lever, *Histopathology of the Skin*, J.B. Lippincott Co., 1975, pág. 420. "El vitíligo es una enfermedad sistémica caracterizada por la pérdida de las células pigmentarias, principalmente en la piel.... La etiología de placas blancas del vitíligo son causadas por la destrucción de muchas o todas las células de pigmento de la piel. Este hecho está bien documentado por estudios con luz y microscopios electrónicos. Tres hipótesis se han propuesto para explicar la destrucción de las células de pigmentación: (1) factores neuroquímicos que son dañinos a las células del pigmento; (2) autodestrucción, y (3) mecanismo inmunológico." (Traducción nuestra.) 2 *Clinical Dermatology*, Philadelphia, Harper & Rows, *Vitíligo*, Unit 11-33, pág. 1; 6B Whitmore, *The Skin*, Ap. II 87.

(5) El doctor Sánchez, como perito del demandado Mark, testificó que era vitíligo. Sin embargo, luego aclaró que al examinar a la Sra. Nélida Ríos Ruiz no realizó una biopsia, prueba que hubiese despejado cualquier duda al respecto.

las mayores probabilidades —qué *probablemente ocurrió*— según un análisis de la prueba impregnada de la lógica, sentido común, propio conocimiento y experiencia acumulada. *Núñez* v. *Cintrón,* supra, pág. 617; *Cruz* v. *Centro Médico de P.R.,* supra, págs. 744–745.

En la misma medicina se acepta que las "reacciones adversas por drogas administradas para efectos sistémicos son numerosas. Frecuentemente la piel es un órgano objeto de tales reacciones, una de las cuales es una pigmentación aumentada o anormal. Aunque generalmente no es común, con cierta regularidad ocurren anormalidades en la pigmentación causadas por efectos secundarios de ciertas drogas. Varios mecanismos intervienen en estas anormalidades de pigmentación. Sin embargo, en algunos casos, ni el mecanismo ni el pigmento han sido claramente definidos. La droga puede actuar, por ejemplo, estimulando la melanogénesis epidérmica excesiva ... alternativamente, la droga o sus metabolitos pueden unirse con melanina y modificar el color normal de la piel.... Algunos medicamentos ... directamente manchan la piel. En algunas ocasiones la droga puede de hecho promover la acumulación de otros productos del pigmento.... La decoloración puede ser también el resultado de diversos factores". (Traducción nuestra.) 2 *Clinical Dermatology,* Philadelphia, Harper & Rows, Drug Induced Pigmentation Anormalities, Unit 11-22, pág. 1.

## V

Despejada toda duda judicial respecto a la relación causal entre el tratamiento (*Thiotepa*) y la lesión (despigmentación), exploremos el ámbito de responsabilidad profesional del doctor Mark.

Concluimos que el uso aceptado del *Thiotepa,* en la práctica de la oftalmología, no le exime de responsabilidad.

Primeramente, el carácter peligroso, aunque útil, del fármaco recetado para un uso distinto al especificado por el fabricante, le imponía adoptar precauciones especiales, más allá de lo normal al recetarlo. Exigía una diligencia superior a la observada por el Dr. Anthony Mark.[6] "Sin embargo, con esta libertad de recetar drogas para usos no aprobados [por la Administración] —e igual cuando las recetas en dosis varían grandemente los niveles que aparecen en la etiqueta— el médico asume una obligación adicional que se refleja en su responsabilidad civil. Debe haber efectuado un balance entre los beneficios y riesgos. Debe estar seguro que el cambio en la dosis aprobada, frecuencia y modo de administrar, o recetarla para un uso no aprobado, estuvo basado en un juicio profesional adecuado. Hay unas consideraciones morales y éticas aplicables al uso seguro de seres humanos por investigaciones en drogas, más allá de la ley. De hecho, una mirada retrospectiva refleja muchas veces que una demanda no hubiese ocasionado una litigación si el médico hubiese compartido, con el paciente o sus

---

[6] "¿Puede un médico recetar una droga para algo que el fabricante no'ha indicado? Como saben, inserto en el paquete de la droga y en el P.D.R. aparecerán secciones para sus indicaciones.... La contestación es en la afirmativa. Puede hacerlo porque el fabricante de la droga y la ley no le dicen al médico cómo practicar la medicina. Pero puedo decirles que cuando están recetando drogas fuera de sus indicaciones, están en más riesgo que si la estuvieran recetando para aquello que el fabricante indica y la vende. Estarán en base más sólida, si las indicaciones de la receta que están dando surgen de la comunidad y la literatura médica. Cuando se va a reuniones y se leen revistas, allí se discute y se lee sobre el uso. Puede ser una práctica común usar una droga—y así reconocido en los círculos médicos para algo que el fabricante no la especificó. Cuando eso ocurre, usualmente el fabricante extenderá su aplicación y venta, si se justifica por su frecuencia. Pero a menos que tenga buena evidencia de que la droga es efectiva para esa condición y así lo respalde la práctica y literatura médica, uno está en borde.... *Siempre que ponga a un paciente en una droga por primera vez y le hable sobre su propósito y efectos secundarios, anótelo en el récord de manera sencilla: 'discutido con el paciente el propósito de la droga, sus alternativas, riesgos y efectos secundarios'.*" (Traducción nuestra y énfasis suplido.) G. Michaud, *Esq.*, *Prescription Drugs; Reactions; Package Inserts and Liability*, Medicolegal, 1979, National Symposium, págs. 69–70.

representantes su decisión." (Traducción nuestra.) M.A. McEniry y S.H. Willig, *The Federal Food, Drug and Cosmetics Act and the Medical Practitioner*, 29(11) Food Drug Cosm. L.J. 551–552 (1974). *Segundo*, en lenguaje sencillo y comprensible, debió informarle a su paciente, la señora Ríos Ruiz, que se trataba de un fármaco cuyo uso oftálmico no estaba aprobado por el fabricante ni la Administración federal, pero también debió exponerle que se usaba en la oftalmología con cierto éxito para evitar la recurrencia del pterigión. En esa exposición tenía que advertirle que podía tener efectos incidentales secundarios, y así obtener un consentimiento *informado* para el tratamiento. Hardin, *op. cit.*, pág. 79; McEniry y Willig, *op. cit.*, pág. 555. Y *tercero*, ésta era la segunda vez que el doctor Mark exponía a la señora Ríos Ruiz a los efectos del *Thiotepa*. El argumento de que antes su uso no le había causado daños pasa por alto que en muchas ocasiones son los efectos *acumulativos* por repeticiones o sobredosis los que causan las reacciones o efectos secundarios nocivos. Además, si en la primera ocasión el *Thiotepa* no funcionó, pues no evitó la recurrencia del pterigión, ¿por qué volvió a recetarlo? Todas estas razones sostienen ampliamente su responsabilidad. Nota, *Malpractice: Physicians' Liability for Injury or Death Resulting from Side Effects of Drugs Intentionally Administered to or Prescribed for Patient*, 45 A.L.R. 3d 928. Contra esta conclusión el doctor Mark no puede alegar ignorancia o desconocimiento de la despigmentación como posible efecto secundario. Hemos visto cómo la literatura médica en su campo, desde 1969, informaba y alertaba sobre casos de despigmentación, en particular en personas de ascendencia latina, incluso puertorriqueños. La ley supone que todo médico en la práctica activa de su profesión se mantiene al día en los conocimientos, adelantos e información, en particular en el ámbito de su especialidad.

Hardin, *op. cit.*, pág. 76; R. Carlenton, *Physician Liability for Adverse Drug Reactions*, Med. Trial Tech. Q. 184-187 (1978). J.J. Junewicz, *Physician's Liability for Failure to Anticipate and Control Reactions and Interactions Precipitated by Prescribed or Administered Drugs*, Med. Trial Tech. Q. 2, 23-24 (1980). Más aún, se "presume que el médico promedio lee las revistas médicas contemporáneas.... Se informan muchas otras instancias de advertencias similares a médicos y cirujanos de los peligros de las drogas. Por lo tanto, el médico debe mantenerse al día en la literatura médica para protegerse de acciones de mala práctica cuando el administrar una droga causa complicaciones". (Traducción nuestra.) B.J. Ficarra, *Surgical and Allied Malpractice*, Illinois, C.H. Thomas, 1968, pág. 825.

"La doctrina de consentimiento informado está basada en una larga tradición de promover la propia autonomía y un proceso decisorio racional. La cantidad de información que debe exponer el médico al paciente es aquella que le permita a éste decidir por sí mismo si va o no a someterse al tratamiento recomendado. Incluye información sobre riesgos de muerte o graves lesiones corporales, probabilidades de éxito, problemas en la recuperación y modos alternos de tratamiento. El proveer esta información contribuye a la relación médico-paciente y disminuye que se recurra a demandas por mala práctica si el tratamiento o resultado no es satisfactorio." G.J. Annas, *Avoiding Malpractice Suits Through the Use of Informed Consent*, Leg. Med. Annual 231 (1977). A. Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking*, Wis. L. Rev. 413 (1979); Nota, *Modern Status of Views as to General Measure of Physicians' Duty to Inform Patient of Risks of Proposed Treatment*, 88 A.L.R. 3d 1008 (1978); R.E. Ritts, *A*

*Physician's View of Informed Consent in Human Experimentation*, 36 Fordham L. Rev. 631-638 (1968); Junewicz, *op. cit.*, págs. 31-32.

"Uno de los indicadores del aprendizaje profesional médico es su conocimiento en farmacología, que es una ciencia básica importante de la medicina." (Traducción nuestra.) Hardin, *op. cit.*, pág. 76. La misma está íntimamente relacionada con el deber de informar. "Definir los riesgos presenta unas preocupaciones particulares. La rareza del riesgo no lo remueve de la esfera de la información." (Traducción nuestra.) Íd., pág. 79. Ello es así, pues "debe darse cuenta de que la misma droga administrada a personas diferentes puede no tener efectos farmacológicos idénticos y universales. La acción de las drogas no es exacta, no siempre puede anticiparse y no es universalmente predecible. La diversidad de reacciones humanas a las drogas hace intelectualmente imposible establecer reglas y reglamentos definitivos y científicos para controlar el uso de medicamentos. La fisiología de las drogas no es una ciencia exacta sino un humanismo científico". (Traducción nuestra.) Ficarra, *op. cit.*, pág. 826.

Aclaramos, respecto a nuestros pronunciamientos relativos al deber de información, que "hay que tener en cuenta que *los médicos no están obligados a impartir a sus pacientes un curso completo de medicina cada vez que éstos se sometan a un acto médico*, sino que en principio puede pensarse que cuando una persona se dirige a un médico, pone en él su confianza, y pretende que éste le cuide de acuerdo con sus conocimientos, por lo que en principio acepta todos los actos terapéuticos del médico. *Precisamente la información leal* está en la *advertencia* por parte del médico *de aquellos peligros desconocidos para el enfermo, que éste no puede saber, porque cuando se dice que la información* ha de ser leal y honesta, se quiere decir que el médico no

debe traicionar la confianza que en él ha puesto el paciente". (Énfasis nuestro.) J. Ataz López, *Los Médicos y la Responsabilidad Civil*, Madrid, Ed. Montecorvo, 1985, pág. 74.

Finalmente, si añadimos la forma temeraria e imprudente en que el doctor Mark realiza la segunda operación —sin adecuada luz eléctrica y cerca de una ventana— es evidente su negligencia. Lo menos que puede admitirse es lo cuestionable de si efectivamente en esta nueva ocasión el doctor Mark extirpó todo el tejido del pterigión que era menester. Jurídica y moralmente tenemos la certeza —al igual que el ilustrado foro de instancia— de que se demostró la negligencia y relación causal. "El juez, '[h]a de propender hacia la *certeza moral*, excluyendo toda duda que razonablemente pudiera albergarse; para su logro son cualidades indispensables un estricto sentido de moralidad personal y una intensa cultura jurídica. De ahí que deba saturarse en la convicción de la necesidad de formar una *conciencia moral* adecuada, marco que dignifique y aureole su vida profesional; ... Es la conciencia —escribe Peinador— la norma de la moralidad subjetiva, y, sin ella, la norma objetiva, que lo es la ley divina y humana, resulta prácticamente inoperante; una conciencia bien formada es la mejor garantía de una moralidad en todo conforme con los preceptos a que tiene que ajustarse la actividad del hombre, la general o la profesional.... Siempre sabrá prestar oídos, en última instancia, a la voz de la conciencia, verdadera pauta de moralidad difícilmente falible cuando la inteligencia está ilustrada por la ciencia y la voluntad disciplinada por la moral. Todos sabemos de las constantes y moduladas inflexiones de esta voz insobornable, fértil consejera, desinteresada amiga, a veces suavemente tranquilizadora, en otras insistentemente admonitiva.' (Escolios omitidos.) F. Soto Nieto, *Compromiso de Justicia*,

Madrid, Ed. Montecorvo, 1977, pág. 22." (Énfasis en el original.) *Núñez* v. *Cintrón*, supra, págs. 619–620.

—O—

Voto particular emitido por la Juez Asociada Señora Naveira de Rodón.

A pesar de que me uno a la opinión de la mayoría, quisiera hacer las siguientes expresiones sobre el deber de mantener a un paciente informado.

Bajo las circunstancias de este caso, antes de imponer responsabilidad al doctor Mark por haber faltado a su deber de información, era necesario probar que existía ese deber de información como práctica prevaleciente en la comunidad médica. *Oliveros* v. *Abréu*, 101 D.P.R. 209, 226 (1973); *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983). En el caso ante nos surge de la prueba que los demandantes no establecieron que existe un deber de informar en casos en que se le dé uso oftálmico al *Thiotepa* y más aún a través de testimonios periciales, la parte demandada estableció que la dosis recetada a la paciente en este caso no conllevaba riesgos significativos que requirieran un deber de informarlos al paciente.