# 96 DTA 128

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL DE BAYAMON
### PANEL II

GUILLERMINA VACHIER GUZMAN
Demandante-Apelada

v.

DR. JOSE A. SEGARRA
Demandado-Apelante

Núm. KLAN-96-00393

San Juan, Puerto Rico, a 30 de septiembre de 1996

Panel integrado por su presidenta, la Jueza Ramos Buonomo
y los Jueces Cordero y Ortiz Carrión

Ramos Buonomo, Jueza Ponente

El apelante, Dr. José A. Segarra, (en adelante, *"Dr. Segarra"*) nos solicita la revocación de la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Bayamón el día 15 de marzo de 1996 en una acción por impericia médica presentada contra él por la /parte apelada, señora Guillermina Vachier Guzmán (en adelante, *"Sra. Vachier Guzmán"*).

En su recurso nos señala que el tribunal sentenciador cometió en síntesis los siguientes errores:

*"1) Incurrió en error al concluir que el apelante, Dr. Segarra, no le informó a la apelada el riesgo de parálisis facial al practicarle una cirugía cosmética en el rostro.*

*2) Incurrió, además, en error al permitir prueba sobre la falta de consentimiento informado y basar su sentencia condenatoria en tal doctrina a pesar de que la parte no alegó en su demanda ni en el acta de conferencia con antelación al juicio, una causa de acción basada en dicha doctrina y a pesar de que el apelante objetó oportunamente esa prueba durante el juicio.*

*3) Incurrió en error al condenar al apelante a pagar $75,000.00 a la apelada por los daños reclamados por ella debido a la contractura del lado derecho de la cara cuando ésta, además, no fue producida por la cirugía ni se estableció una complicación reconocida de la misma; y*

*4) Al no resolver que la demandante incurrió en negligencia que fue la causa legal de cualquier daño sufrido por ella."*

Examinados los alegatos presentados por las partes, la exposición estipulada de la prueba oral, los autos originales, la ley y la jurisprudencia, este Tribunal determina que el tribunal sentenciador incidió y procede revocar la sentencia.

## I

La parte apelada, señora Vachier Guzmán, presentó una demanda en daños y perjuicios alegando en síntesis impericia médica contra el apelante, Dr. Segarra, al practicarle una cirugía cosmética en el rostro y en los párpados de ambos ojos, así como una lipectomía submental, y que debido a la negligencia médica del apelante se lesionó el nervio facial izquierdo produciéndole una parálisis facial periferial, así como una desviación del rostro hacia el lado derecho, alegando otros daños y angustias mentales.

En su contestación a la demanda el apelante admitió que el día 3 de noviembre de 1989 practicó una cirugía cosmética a la demandante y que, posteriormente, ella tuvo una debilidad facial en el lado izquierdo del rostro. Negó que la condición alegada por la demandante fuera producto de la cirugía o que él hubiere incurrido en impericia profesional médica, alegando como defensas afirmativas que el tratamiento médico y quirúrgico brindado a la demandante cumplió con las normas y exigencias profesionales requeridas en la profesión médica y que los daños por los cuales reclamaba la demandante no habían ocurrido por impericia o negligencia de su parte.

Luego de llevar a cabo un extenso descubrimiento de prueba, el cual incluyó notificación y contestación de interrogatorios, toma de deposiciones y exámenes médicos a la demandante, y luego de celebrada la conferencia con antelación al juicio, se celebró durante varios días la vista en los méritos del caso.

Durante el juicio declararon por la parte demandante la propia demandante, así como la Dra. Wilma Lluberas, especialista en medicina física y rehabilitación, el Dr. Angel Chinea Martínez, neurólogo, el Dr. Miguel Cubano, psiquiatra, la Sra. Aglaé Renovales Colón y la Sra. Nelly Vachier Rangel. Por la parte demandada prestaron testimonio el propio demandado Dr. Segarra, el Dr. Walter J. Benavent, especialista en cirugía cosmética, el Dr. René Cardona Campos, neurocirujano, y el Dr.

José Rafael Carlo, neurólogo. Ambas partes presentaron prueba documental la cual consistió principalmente de los récords médicos de la demandante Sra. Vachier Guzmán, el récord médico de ella en la oficina del doctor Segarra, el récord de hospitalización en el Hospital San Pablo para la cirugía en cuestión, los informes de los médicos que la evaluaron, así como literatura médica relacionada con diferentes aspectos médicos planteados en este caso.

De entrada hay que señalar que el tribunal *a quo* resolvió haber quedado convencido que el apelante no incurrió en negligencia profesional al efectuar la cirugía a la demandante, así como tampoco fue negligente en el tratamiento y cuido post-operatorio. Sentencia, pág. 5, segundo párrafo.

De la sentencia dictada surge que el tribunal *a quo* consideró probados los siguientes hechos:

*"a) A la demandante se le explicó el procedimiento quirúrgico y se le orientó sobre el cuidado post-operatorio en la oficina del apelante. Sentencia, pág. 3, último párrafo;*

*b) El 2 de noviembre de 1989, como parte del procedimiento de preadmisión al Hospital San Pablo, la demandante suscribió un documento en el cual dicha parte prestó su consentimiento para que el doctor Segarra realizara la operación y admitió conocer la naturaleza y objeto de la operación, los riesgos envueltos y las posibles complicaciones de la cirugía. Sentencia, pág. 4, segundo párrafo. Este documento forma parte del Exhibit II de la demandante cuya admisión se estipuló;*

*c) Las anotaciones en el expediente del Hospital San Pablo realizadas por los médicos y por las enfermeras que intervinieron en la sala de operaciones indican que no surgieron complicaciones durante el curso de la operación.*

*d) Los testimonios de los peritos presentados por la parte demandante no demostraron ni expusieron la inexistencia o incumplimiento de alguno de los estándares de debido cuidado durante el período operatorio y post operatorio. Sentencia, pág. 6, primer párrafo". e) El tribunal a quo quedó convencido de que el procedimiento quirúrgico utilizado por el demandado Dr. Segarra durante la operación y el período post operatorio cumple con las técnicas quirúrgicas aceptadas dentro del campo de la cirugía estética moderna y que el demandado ejecutó las mismas con destreza y experiencia. Sentencia, pág. 5, segundo párrafo y pág. 6, primer párrafo; Informe médico del Dr. Benavent de 19 de agosto de 1991, Exhibit 2 del apelante, pág. 121 del apéndice conjunto. f) El Dr. Segarra declaró que cuatro días después de la operación observó una debilidad en la parte izquierda superior de la boca de la demandante y una virazón mínima en el lado izquierdo. Sentencia, pág. 7, primer párrafo; g) Luego de hacer una relación detallada de las citas post-operatorias durante las cuales el doctor Segarra trató a la demandante, el tribunal concluyó que ante el cuadro clínico que presentaba la demandante y conforme a los testimonios periciales vertidos en corte abierta por el cirujano plástico, Dr. Walter J. Benavent, y por los neurólogos, Dr. René Cardona Campos y Dr. José Carlo, la atención y el seguimiento médico prestados por el doctor Segarra cumplieron con las expectativas razonables y esperadas en la práctica de la medicina moderna. Sentencia, pág. 8, último párrafo; h) El tribunal concluyó que el apelante no actuó de forma negligente ni omitió el debido cuidado, sino que por el contrario, según los peritos, éste cumplió con su deber de previsibilidad al recomendar la evaluación de la paciente por otro especialista en una etapa adecuada. El apelante ya había advertido y recomendado a la demandante ejercicios de estimulación mecánica en las áreas del labio y del párpado, todo ello sin que se afectara o dilatara la recuperación de la totalidad de la operación en sí, pues el apelante siguió de forma prudente la recuperación de la paciente. El tribunal, apoyado en los testimonios periciales, concluyó que el apelante actuó con la debida prudencia y en consideración a la recuperación necesaria después de la cirugía. Sentencia, pág. 9, primer párrafo;*

*i) El Dr. Segarra refirió la paciente a la Dra. Wilma Gómez de Lluberas, especialista en medicina física y rehabilitación, quien recomendó a la demandante someterse a terapia de estimulación eléctrica, masajes y ejercicio. Además, le recetó una muleta facial para impedir una condición de fibrosis muscular. En febrero de 1990 el Dr. Rafael Oms, en el Hospital Santo Asilo de Damas en Ponce, practicó un estudio a la demandante que reveló una lesión parcial del nervio facial izquierdo tipo neuropráxico, lo cual significa que no hay un nervio cortado (neuromesis), sino un bloqueo temporero del nervio. Tanto la doctora Lluberas como el neurólogo Dr. Angel Chinea Martínez,*

*quienes sirvieron como peritos de la parte demandante, coincidieron con el diagnóstico del doctor Oms. Sentencia, págs. 9 y 10;*

*j) La demandante recibió tratamiento de terapia y rehabilitación con la doctora Lluberas quien hizo constar en su récord, y así lo declaró en el juicio, que la demandante no asistió con regularidad a la terapia física recomendada para su problema en el rostro y dejó de usar la muleta facial que le había recomendado la fisiatra. Del testimonio de la doctora Lluberas se desprende también que la demandante no siguió las recomendaciones de terapia diaria. Al ser contrainterrogada, la referida doctora aceptó que pudo haber hecho una diferencia si la demandante hubiera recibido la terapia según se le ordenó. A la misma conclusión llegaron los doctores Carlo y Chinea, según surge de sus declaraciones sobre la recuperación de la demandante. Sentencia, pág. 10;*

*k) El 13 de junio de 1990, siete meses después de la cirugía, la demandante visitó la oficina del doctor Segarra y de las anotaciones hechas por éste en el récord de oficina se desprende que él observó demasiada actividad en el lado derecho de la cara de la demandante pero que el lado izquierdo había mejorado en forma definitiva y que la referiría a otro especialista para evaluación. La demandante fue referida donde el neurocirujano Dr. René Cardona Campos quien la examinó y evaluó el 20 de junio de 1990. Sentencia, pág. 11; Informe del Dr. René Cardona Campos de 20 de junio de 1990, Exhibit 3 del demandado;*

*l). La opinión del Dr. René Cardona Campos fue que la demandante sufría de un espasmo hemifacial en el lado derecho del rostro ocasionado por una compresión neurovascular en la zona de entrada del nervio número siete. El Dr. Cardona Campos indicó, tanto en su informe escrito como en su testimonio oral en el juicio, que aunque inicialmente la demandante tuvo debilidad facial en el lado izquierdo luego de la operación, posteriormente su condición había mejorado. Más aún, la condición que presentó la demandante en el lado derecho de la cara en junio de 1990, la cual él diagnosticó como espasmo hemifacial, es una condición diferente diametralmente opuesta a la debilidad que manifestó la demandante anteriormente en el lado izquierdo del rostro. El doctor Cardona reafirmó su diagnóstico basándose en los estudios electromiográficos realizados por el doctor Oms y en la evaluación del doctor Carlo. En su opinión los estudios confirmaron que el nervio facial izquierdo nunca fue cortado y que inicialmente la demandante sufrió una lesión leve en la conducción del nervio izquierdo, de lo cual mejoró significativamente. También declaró el doctor Cardona, y así lo concluyó el tribunal, que ninguno de los testimonios periciales ni lo informado en la literatura médica que obra en autos establece una correlación entre la condición del lado izquierdo del rostro que inicialmente presentó la demandante y la condición de marcada contracción en el lado derecho que manifestó siete meses después. Sentencia, págs. 11 y 12;*

*ll) Aunque el doctor Chinea, perito presentado por la parte demandante, no coincidió con el diagnóstico de espasmo hemifacial del doctor Cardona, toda vez que el doctor Chinea consideraba que la paciente tenía una parálisis tipo Bell (Bell's Palsy), no pudo sin embargo el doctor Chinea establecer una causa específica para explicar la condición de la demandante y para relacionar dicha condición con la cirugía y con el tratamiento realizado por el demandado doctor Segarra. Sentencia, pág. 12;*

*m) Todos los peritos que testificaron en el juicio coincidieron en que la demandante sufre de una disminución en la amplitud del nervio facial, condición que puede resultar ser transitoria o temporera, pero que resulta muy difícil determinar la etiología u origen de tal condición. El tribunal a quo concluyó que una lesión al nervio facial puede ocurrir como consecuencia del tipo de operación practicada a la demandante aunque no es una complicación frecuente de dicho procedimiento. Sentencia, pág. 12;*

*n) El tribunal concluyó, además, que la evidencia sometida a través de los expedientes médicos, las pruebas de conducción nerviosa, las evaluaciones médicas y los testimonios de los peritos médicos, no apoyan la teoría de la demandante y que la condición física que actualmente manifiesta ésta en el lado derecho de su rostro no fue causada por la condición que presentó inicialmente en el lado izquierdo de la cara después de la operación. El tribunal concluyó también que el apelante Dr. Segarra no actuó negligentemente ni se apartó de las normas y prácticas profesionales de la medicina moderna, ni incurrió en error de juicio al evaluar y recomendar a la demandante su tratamiento y*

*cuidado médico. Sentencia, pág. 13."*

El tribunal expresa en la sentencia que los hechos antes mencionados, contenidos en las páginas 3 a la 13 de su Sentencia, son hechos que consideró probados. En síntesis concluyó que el doctor Segarra actuó conforme a las normas y exigencias profesionales de la profesión médica en todas las etapas antes, durante y después de la operación, y tanto en el tratamiento ofrecido como en las alternativas de consultas y tratamientos médicos con otros galenos. Sentencia, pág. 23. Por consiguiente, el tribunal sentenciador exoneró al doctor Segarra de responsabilidad por negligencia en el procedimiento quirúrgico y en el tratamiento médico.

No obstante lo anterior, el tribunal dictó sentencia a favor de la parte demandante e impuso responsabilidad al doctor Segarra bajo la teoría legal de falta de consentimiento informado, condenándolo a pagar la suma de $75,000.00 a la apelada. El tribunal *a quo* concluyó que el doctor Segarra únicamente informó a la demandante sobre los riesgos generales de someterse a la cirugía cosmética, pero que no le informó que el riesgo de parálisis es una complicación que puede resultar de una liposucción submental. Sentencia, pág. 21. En la página 3 de su sentencia también indica el tribunal que la apelada negó en el juicio haber recibido advertencias sobre riesgos tales como muerte, necrosis o parálisis asociados a la operación y aunque en la página 21 de la sentencia el tribunal expresa que dio mayor peso al testimonio vertido por la apelada sobre los riesgos de los cuales fue informada, el testimonio del apelante y la preponderancia de la evidencia documental que sobre este tema desfiló demostró que el médico sí proveyó a la paciente más información que la requerida por la doctrina tal y como veremos más adelante.

## II
## DISCUSION DE LOS ERRORES PLANTEADOS

Analicemos primeramente el segundo error señalado que gira en torno a que el tribunal *a quo* permitió prueba sobre la falta de consentimiento informado a pesar de que el apelante la objetó oportunamente.

La demanda presentada no contiene alegación alguna que establezca una causa de acción basada en falta de consentimiento informado. Es decir, la Sra. Vachier Guzmán, no alegó en su demanda que el Dr. Segarra no le explicó los riesgos inherentes a la cirugía que con alguna frecuencia pueden producirse. En el informe de Conferencia con Antelación al Juicio tampoco expuso la demandante en su teoría legal del caso una causa de acción basada en falta de consentimiento informado. No fue hasta el acto del juicio, cuando ya no se podía efectuar descubrimiento de prueba en torno a ese aspecto, que por primera vez la apelada declaró que el Dr. Segarra no le había informado sobre los riesgos del procedimiento. Surge de la Exposición Narrativa Estipulada de la Prueba Oral que el apelante, Dr. Segarra, objetó en el juicio ese testimonio. No obstante, la objeción del apelante fue denegada por el tribunal de instancia. Véase el párrafo número 35 de la Exposición Estipulada de la Prueba Oral.

En el caso de Sepúlveda de *Arrieta v. Barreto*, ___ D.P.R. ___ (1994), **94 J.T.S. 158**, se concedió compensación a la parte demandante bajo la doctrina de falta de consentimiento informado aun cuando la parte demandante no había hecho alegación alguna en la demanda sobre esa causa de acción. No obstante, el caso de Sepúlveda de Arrieta, es distinguible del caso de autos pues allí nuestro más alto foro enfatizó que cuando la demandante declaró en el juicio que no se le había explicado el riesgo de la cirugía, **la parte demandada no objetó esa declaración.** Por ello resuelve el Tribunal Supremo que se activó la Regla 13.2 de Procedimiento Civil y, por consiguiente, las alegaciones quedaron enmendadas por la prueba. En el caso de autos, como ya hemos visto, el apelante objetó a que se presentara esa prueba pues la misma no había sido alegada en la demanda, ni tampoco se había configurado una causa de acción de falta de consentimiento en el informe de conferencia con antelación al juicio.

Es preciso reconocer que la doctrina prevaleciente en el Procedimiento Civil moderno sostiene que las enmiendas para conformar las alegaciones con la prueba deben permitirse con liberalidad. No obstante, según reconoce la jurisprudencia, dicha liberalidad no es infinita y está condicionada por un juicioso ejercicio de la discreción judicial, que habrá de ponderar, entre otros, los siguientes factores: el momento en que se solicita, el impacto en la adjudicación de la cuestión litigiosa y la razón o

justificación para la demora e inacción incurrida por la parte que solicita la enmienda. Debe considerarse, además, el perjuicio que la misma causaría a la otra parte al plantearse tardíamente. En *Vidal v. Suro*, 103 D.P.R. 793 (1975), el demandado no levantó la defensa de prescripción hasta el momento del juicio. Reconociendo el principio de que las enmiendas bajo la Regla 13.2 se concederán liberalmente cuando la justicia así lo requiera, el Tribunal Supremo expresó ver muy poca justicia en exonerar vía prescripción a una parte que se guardó dicha defensa hasta el mismo momento del juicio.

*"La liberalidad de la Regla 13.1 para conceder enmiendas no es infinita; está condicionada por un juicioso ejercicio de discreción que ha de ponderar por el momento en que se solicitan; su impacto en la pronta adjudicación de la cuestión litigiosa; la razón o ausencia de ella para la demora e inacción original del promovente de la enmienda; el perjuicio que la misma causaría a la otra parte, y hasta la naturaleza y méritos intrínsecos de la defensa que tardíamente se plantea."*

*Vidal v. Suro*, supra, a la pág. 796.

En *Duchesne Landrón v. Ruiz Arroyo*, 102 D.P.R. 699 (1974), el tribunal de instancia excluyó aquella parte de la prueba de los demandados que se refería a pérdida de ingresos por no haber sido la misma alegada en su reconvención. El Tribunal Supremo concluye que no hubo abuso de discreción del tribunal de instancia al denegar una enmienda de última hora para incorporarla a las alegaciones.

La Regla 15 de Procedimiento Federal, de donde proviene nuestra Regla 13, ha recibido una interpretación liberal de los tribunales con el propósito de proveer la oportunidad para que las reclamaciones se adjudiquen en los méritos. Al igual que las Reglas de Procedimiento Civil nuestras, las Reglas Federales se basan en el principio de que las alegaciones notificarán a grandes rasgos la naturaleza de las reclamaciones o defensas pero no existe la obligación de explicar los hechos y las controversias en una forma detallada. Wright & Miller, Federal Practice and Procedure, Minnesota, 2nd Ed., West Publishing Co., (1990); Vol. 6, Sec. 1471, págs. 502 a la 507. No obstante lo anterior, los tribunales federales en repetidas ocasiones han excluido prueba o causas de acción traídas a última hora por una parte, cuando ello resultaría en perjuicio para la parte contraria. Se ha resuelto que una parte que ha permitido que una causa de acción languidezca por tres años no puede a última hora mediante una enmienda a la demanda. *Smith v. Duff and Phelps, Inc.*, 5 F.3d 488 (1993). Tampoco se permitió a una parte enmendar la demanda una semana antes del juicio para incluir una nueva causa de acción, cuatro años después de haber radicado la demanda original, por cuanto ello causaría perjuicio a la parte contraria. *Ashe v. Corley*, 992 F.2d 540, 543 (1993). Bajo los mismos principios se ha negado autorización a un demandado para enmendar la demanda a última hora a los fines de levantar las defensas de estoppel y prescripción. *Harrison Beverage Company v. Dribeck Importers Inc.*, 133 F.R.D. 463 (1990).

Wright & Miller documentan en su obra que los tribunales federales han denegado el permiso para radicar alegaciones suplementarias tardías.

*"Nonetheless, courts occasionally have denied leave to file supplemental pleadings and they have done so for a variety of reasons. For example, a motion under Rule 15(d) has been denied because the claim por defense asserted in the supplemental pleading bore little or no relationship to the original pleading. **If the moving party is guilty of inexcusable delay or laches,** the supplemental pleading will not be permitted. The same will be true if the supplemental pleading deals with events that ocurred before the filing of the original pleading and in reality is an amended pleading..."* (Enfasis suplido.)

Wright & Miller, Federal Practice and Procedure, Vol. 6A, Sec. 1510, págs. 208 y 210.

Otro importante instrumento del Procedimiento Civil moderno que no favorece las enmiendas tardías es la conferencia preliminar. El propósito de la conferencia con antelación al juicio, cada vez más útil en la litigación, es que las partes expongan sus teorías y su prueba y establezcan las controversias sobre las cuales versará el juicio. La conferencia con antelación al juicio brinda a la partes una oportunidad para exponer sus teorías y anunciar nueva evidencia, aun cuando éstas difieran de las **alegaciones hechas originalmente por las partes.** Por tanto, ello hace menos justificable aún el traer sorpresivamente una nueva causa de acción cuando el juicio ya está en proceso. Sobre este particular la obra de Wright & Miller, *supra*, nos indica lo siguiente:

*"The pretrial conference should not be viewed as merely an informal meeting at which those involved can act without concern for future consequences. If the conference is to be a useful tool, all participants must be fully aware of the possible effects the pretrial hearing may have on the trial. When the conference is held after the discovery process is completed or shortly before trial, counsel presumably have identified virtually all of the evidence relating to their cases. Thus, it would not be unreasonable to hold them to the statements they make and the agreements they enter into at the conference or **restrict their proof at trial to the issues set forth in the pretrial order.***

*Courts generally hold stipulations, agreements, or statements of counsel made at the pretrial conference binding for purposes of the trial. **This practice furthers the Rule 16 policy of limiting the trial to those issues that are actually in dispute without impairing the basic rights of the litigants."***
(Enfasis suplido.)

Wright & Miller, Federal Practice and Procedure, Vol. 6A, sec. 1527, págs. 262-264; *Mull v. Ford Motor Company,* 368 F.2d 713, 716 (1966).

Es importante que los tribunales tomen en consideración, a los fines de decidir si permite o no la causa de acción que se trae tardíamente, si la parte que pretende traer la nueva causa tenía conocimiento desde hacía tiempo de los hechos en que basa la nueva causa de acción traída el día del juicio. En varios casos se ha resuelto que cuando los demandantes tienen conocimiento con razonable antelación de los hechos en que se basa la nueva causa de acción, la prueba debe excluirse. *Starling v. Fuller,* 49 F 3d 1092 (1995); *Canal Insurance Company v. First General Insurance Company,* 889 F.2d 604 (1989). En el presente caso no existe justificación alguna para que la parte demandante no alegara en la demanda la causa de acción basada en falta de consentimiento informado pues eran hechos que la demandante necesariamente conocía desde la fecha cuando se efectuó la cirugía. A más tardar, debió alegarla en el Informe de Conferencia con Antelación al Juicio. Pretender hacerlo cuando el juicio ya había comenzado, sin ofrecer explicación alguna para la tardanza y sin que se hubiese efectuado descubrimiento de prueba sobre esa nueva causa de acción traída tardíamente, colocó al apelante en una situación de desventaja e indudablemente le ocasionó perjuicio sustancial en esa etapa del procedimiento. De haberse alegado con razonable prontitud, el apelante pudo haber cubierto en una deposición lo relativo a la falta de consentimiento con el propósito de usar la deposición para fines de impugnación. También pudo procurar testigos, para establecer que la señora Vachier Guzmán tenía conocimiento de los riesgos. No lo hizo el apelante porque sencillamente no existía tal controversia toda vez que la apelada nunca alegó falta de consentimiento informado.

El ilustrado tribunal *a quo* se excedió en su discreción al permitir que la apelada enmendara las alegaciones de su demanda, **en medio del juicio** para traer una causa de acción **independiente y distinta,** como lo es la falta de consentimiento informado, a pesar de la oportuna objeción del apelante. Al así actuar incidio. *Santiago v. Méndez,* ___ D.P.R. ___ (1994), **94 J.T.S. 38,** a la pág. 11709.

**El concepto de discreción judicial está inexorablemente e indefectiblemente atado al concepto de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera.** *Pueblo v. Ortega Santiago,* 125 D.P.R. 203, 211 (1990); *Pueblo v. Sánchez González,* 90 D.P.R. 197, 200 (1964). Ejercitada la discreción judicial **sin mesura, podría desembocar en capricho y arbitrariedad.** Se incurre en ello, entre otras maneras y en lo pertinente, cuando el tribunal, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto. *Pueblo v. Ortega Santiago, supra.*

Incidió el tribunal *a quo* al permitir prueba sobre falta de consentimiento informado y basar su sentencia condenatoria en tal doctrina.

Lo anteriormente resuelto y concluido sería suficiente para revocar la sentencia apelada. No obstante, entendemos conveniente, además, discutir el primer señalamiento de error.

El tribunal apelado incurrió en error, además, al concluir que el Dr. Segarra no le informó a la demandante sobre el riesgo de parálisis facial.

Un análisis desapasionado y objetivo de la prueba desfilada, no empece la simpatía y el sentimiento de compasión que nos mueve al enfrentarnos a los daños sufridos por la apelada, nos lleva a la conclusión de que la determinación del tribunal de imponer responsabilidad al apelante bajo la doctrina de falta de consentimiento informado no constituye el balance más racional, justiciero y jurídico de la totalidad, de la prueba presentada en el caso. Santiago, a la pág. 11710; *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980). Tal y como ocurrió en **Zambrana**, *"la prueba en el caso ante nuestra consideración consistió esencialmente en testimonio pericial, que es lo que ocurre las más de las veces en casos de responsabilidad de médicos y de hospitales e instituciones dedicadas al cuidado y tratamiento de enfermos. Ante este tipo de prueba consideramos que estamos en iguales condiciones que el tribunal de instancia y en libertad de adoptar nuestro propio criterio"*. Véase, además, *García v. A.F.F.*, 103 D.P.R. 356, 366 (1975). Un examen de la totalidad de la prueba presentada en relación con el aspecto de consentimiento informado demuestra que la conclusión del Tribunal de Primera Instancia fue contraria a la preponderancia de la prueba y, más aún, que sus conclusiones al respecto no encuentran apoyo en la prueba documental ni pericial presentada y son francamente contrarias a la jurisprudencia establecida sobre la materia, según veremos más adelante.

Aun cuando el tribunal *a quo* cita en su sentencia jurisprudencia del Tribunal Supremo de Puerto Rico y de otras jurisdicciones sobre la obligación que tiene un médico de informar todo riesgo material, la aplicación que de esos principios jurisprudenciales hace el tribunal a los hechos específicos de este caso no es la más correcta. Como bien expresó nuestro más alto foro en *Sepúlveda de Arrieta v. Barreto, supra*, a la pág. 545:

*"En definitiva, se sugiere que el deber de información posee una extensión indefinida que debe concretarse en atención a lo expuesto **según cada caso por lo que la regla general deberá ser matizada en cada supuesto conforme al grado de información del paciente y el acto concreto que el médico propone.** [cita omitida] Para esto se hace necesaria la formulación de criterios generales que guíen, en nuestra jurisdicción, la determinación **caso a caso** del contenido particular de la obligación de informar."* (Enfasis suplido.)

Vemos, por tanto, que la aplicación de las normas doctrinales para determinar si la información dada al paciente fue suficiente o no requiere analizar cuidadosamente los hechos específicos de cada caso en particular y las actuaciones de los protagonistas que en última instancia son el paciente y su médico. Nos dice el Tribunal Supremo que el médico debe informar al paciente sobre los riesgos que pueden producirse con más frecuencia, riesgos a los que algún sector de la doctrina ha denominado riesgos típicos. *Sepúlveda de Arrieta v. Barreto, supra*, a la pág. 545, citando con aprobación a Joaquín Ataz López, *Los Médicos y la Responsabilidad Civil*, Editorial Montecorvo, Madrid, 1985, a las págs. 72-73. Los médicos no están obligados a dar a sus pacientes un curso completo de medicina, pero sí a suministrarles suficiente información sobre la naturaleza del tratamiento, los riesgos, las complicaciones y los beneficios que se esperan. Sepúlveda de Arrieta, a la pág. 543; *Ríos v. Mark,* 119 D.P.R. 816, 828 (1987). En *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639, 664 (1988), el Tribunal Supremo estableció que el médico tiene la obligación de divulgar al paciente los riesgos que son **razonablemente previsibles** y los riesgos probables. El médico no es responsable por no divulgar riesgos que razonablemente no puede prever o por no informar de alguna secuela inesperada que surja durante la cirugía. En general, el médico debe divulgar aquella información que él razonablemente crea o debe comunicar aquellos riesgos de los cuales un paciente promedio estaría advertido o sobre aquellos que el paciente en particular haya descubierto por haber sido sometido a un tratamiento similar en el pasado. *Rodríguez Crespo v. Hernández, supra*, a la pág. 644; *Sepúlveda de Arrieta v. Barreto, supra*, a la pág. 546. En este último caso nuestro más alto foro concluyó:

*"Luego de sopesar los criterios correspondientes, lo más apropiado es que adoptemos el criterio del profesional de la medicina, y no el del paciente razonable establecido en Canterbury. Bajo éste, un tratamiento puramente cosmético, como el de la blefaroplastía a que se sometió la señora Sepúlveda de Arrieta, acarrea para el médico el deber de informar **aquellos riesgos conforme lo establecido por la práctica prevaleciente de la medicina. Bajo ninguna circunstancia,** ni siquiera en aquellos tratamientos que no entrañen ningún fin curativo, **tendrá el médico el deber de informar sobre riesgos que sean remotos, que hayan ocurrido en pocas ocasiones o meramente hipotéticos."***
(Enfasis suplido.)

*Id.* a la pág. 546.

En Sepúlveda de Arrieta, *supra*, se impuso responsabilidad al demandado doctor Barreto debido a que la prueba estableció que la demandante firmó un documento en el cual únicamente se le advertía sobre los riesgos de hemorragia y hematomas, pero no se le informó sobre el riesgo de ectropión que es una complicación reconocida de la cirugía de blefaroplastía. En ese aspecto, lo decidido por el Tribunal Supremo en Sepúlveda de Arrieta es acorde con los principios doctrinales aplicables a la obligación del médico de proveer suficiente información al paciente, pues el riesgo de ectropión es una complicación reconocida y nunca se le informó a la paciente. No obstante, este caso es distinguible del caso que nos ocupa pues en éste la prueba demostró que la paciente fue debidamente informada sobre el riesgo específico de parálisis facial **aun cuando todos los peritos médicos testificaron y la prueba documental médica presentada en evidencia estableció y así lo determina el tribunal en su sentencia, a la pág. 12 que la parálisis facial es un riesgo poco frecuente del tipo de operación a que fue sometida la apelada.** Es con la doctrina prevaleciente en Puerto Rico, el apelante no tenía la obligación de informar sobre el riesgo de parálisis facial, por ser poco usual, más aun así lo hizo.

Aun cuando se ha sostenido que, en ausencia de error manifiesto, un tribunal apelativo debe abstenerse de intervenir con la apreciación que de la evidencia sometida hace el juzgador de los hechos en el tribunal sentenciador y que la apreciación de los hechos que hace el foro de origen merece gran respeto y deferencia, esta norma cede en casos apropiados cuando se trata de evaluar las determinaciones que sobre impericia médica hizo un tribunal y que están fundamentadas en prueba pericial y documental. Esto es así pues se considera que un tribunal apelativo puede, al evaluar la prueba pericial y la prueba documental, llegar a sus propias conclusiones. *Santiago v. Méndez, supra,* a la pág. 11709; *Rodríguez Crespo v. Hernández, supra,* a la pág. 649; *Ríos v. Mark, supra,* a la pág. 820; *Cruz v. Centro Médico de Puerto Rico,* 113 D.P.R. 719, 721 (1983).

Una aplicación correcta de los principios de derecho establecidos según anteriormente hemos citado demuestra que en el caso de autos el Dr. Segarra divulgó a la demandante los riesgos razonablemente previsibles que, de acuerdo con el conocimiento y la experiencia del médico, y la práctica prevaleciente en la comunidad médica, necesitaba conocer la paciente para tomar la decisión de consentir al procedimiento quirúrgico. El doctor Segarra informó a la **demandante sobre el riesgo de la parálisis facial,** aun cuando éste es remoto en el tipo de operación a que se sometió la apelada. Por ello no se le puede imponer responsabilidad al apelante por falta de consentimiento informado de la apelada. No obstante, no era previsible, además, la otra condición surgida a la apelada consistente en la contractura del lado derecho de la cara, toda vez que esta última condición no fue causada por la intervención quirúrgica. Según el testimonio de los peritos, esta condición constituye un espasmo hemifacial y no guarda correlación alguna con la complicación de parálisis facial leve surgida en el lado izquierdo de la cara, la cual mejoró significativamente con el tratamiento dado a la paciente. Así lo concluye el tribunal *a quo* a las páginas 11, 12 y 13 de su sentencia.

Veamos ahora por qué la preponderancia de la prueba desfilada en el juicio exonera de responsabilidad al doctor Segarra. La Sra. Guillermina Vachier Guzmán firmó dos autorizaciones separadas y distintas antes de la cirugía. La primera autorización, titulada *"Consentimiento para Operación",* fue firmada el 2 de noviembre de 1989 en la oficina del doctor Segarra y está contenida en el récord médico de la demandante en la oficina del doctor Segarra. Exhibit II de la demandante, pág. 87 del apéndice conjunto. Al así firmar, la demandante reconoció en el párrafo segundo de dicho documento que:

*"La naturaleza y objeto de la operación, los riesgos envueltos y la posibilidad de complicaciones me han sido ampliamente explicados. Reconozco que no se me puede ofrecer garantía absoluta en cuanto a los resultados que deben obtenerse de dicha operación."* (Énfasis suplido.)

Al internarse en el Hospital San Pablo para ser operada, la demandante firmó el 3 de noviembre de 1989 una segunda autorización cuyo texto es esencialmente igual al consentimiento firmado en la oficina del doctor Segarra. Nuevamente reconoce y admite la demandante por segunda vez que la naturaleza y objeto del tratamiento, así como los riesgos y la posibilidad de complicaciones, le fueron ampliamente explicados. Esta segunda autorización forma parte del récord de hospitalización de la

demandante en el Hospital San Pablo. Exhibit II de la demandante, apéndice conjunto. El doctor Segarra declaró durante el juicio que con anterioridad a la cirugía le había explicado a la señora Vachier los riesgos y complicaciones del procedimiento incluyendo sangramiento, infección, sepsis, necrosis de la piel, pérdida de visión, parálisis facial, reacciones alérgicas e inclusive la muerte y que la demandante entendió lo que él le explicó. La preponderancia de la prueba demostró que el doctor Segarra le explicó todo los riesgos aun los que no son frecuentes como la parálisis facial. A la página 12 de la sentencia el tribunal sentenciador concluye que la parálisis facial no es un riesgo frecuente de esa cirugía. Es importante señalar que antes de llevarse a cabo la cirugía la demandante había visitado la oficina del doctor Segarra en dos ocasiones, el 6 de septiembre de 1989 y el 11 de octubre de 1989. En la entrada de fecha 6 de septiembre de 1989 hecha por el doctor Segarra en el récord de oficina, Exhibit I de la demandante, pág. 43 de apéndice conjunto, informa que explicó a la paciente en detalle la cirugía que habría de efectúar, utilizando ilustraciones. También indica dicha nota que el médico explicó a la paciente los riesgos y complicaciones desde necrosis de la piel hasta la muerte misma y que la paciente pareció entenderlo. En esa fecha quedaron en que la paciente llamaría para fijar la fecha de la operación. Así lo hizo y en la anotación del récord de oficina correspondiente al 11 de octubre de 1989 se indica que la paciente decidió someterse a cirugía el 3 de noviembre de 1989 y que el médico le explicó a ella el procedimiento quirúrgico a realizarse, así como el cuidado y las precauciones post-operatorias. En esa fecha se tomaron fotografías de la paciente y ella insistió en que permanecería sólo un día en el hospital, acordándose que sería admitida al hospital el mismo día de la cirugía. Exhibit II estipulado por ambas partes.

De lo anteriormente señalado, surge claramente que el testimonio del Dr. Segarra en el juicio, al efecto de que informó a la paciente sobre el riesgo de parálisis, aun cuando éste no es uno frecuente, está firmemente documentado y corroborado por las admisiones de la demandante en los dos permisos o autorizaciones firmados por ella donde reconoce que los riesgos envueltos le fueron ampliamente explicados, así como por las anotaciones hechas por el doctor Segarra en el récord de oficina con anterioridad a la operación, en un momento en que no existía razón alguna para anticipar una demanda por impericia médica. Si lo anterior no fuere suficiente, el testimonio del doctor Segarra y la prueba documental presentada en evidencia demostraron que el día 11 de octubre de 1989 durante la segunda visita pre-operatoria realizada por la apelada a la oficina del doctor Segarra, ella informó que interesaba someterse a la cirugía el 3 de noviembre de 1989 y el doctor Segarra le entregó la orden de admisión para que ésta se internara y fuera admitida en el Hospital San Pablo. Es obvio que la apelada tuvo la oportunidad de leer dicho documento, el cual estuvo en su poder casi un mes. El mismo expresa que los riesgos posibles y complicaciones fueron explicados a la paciente incluyendo sangramiento, infección, sepsis, necrosis de la piel, pérdida de visión, parálisis facial, reacciones alérgicas e inclusive la muerte. La demandante entregó ese documento en el Hospital San Pablo cuando fue admitida y forma parte del récord de hospitalización de la demandante en el Hospital San Pablo, cuyo récord hospitalario fue admitido en evidencia como Exhibit II estipulado por ambas partes, a la pág. 66 del apéndice conjunto.

De la sentencia dictada en el caso de autos, a la página 22 de la misma, surge que la señora Vachier también había sido sometida anteriormente a otras cirugías cosméticas por otros médicos, una liposucción abdominal y submental en el año 1987, sólo dos años antes, así como otras cirugías que no son de naturaleza cosmética. No puede decirse, por consiguiente, que la demandante sea una persona ignorante que no pudiera entender los documentos que leyó y firmó y que no tuviera capacidad para prever la consecuencia de sus actuaciones al no seguir las recomendaciones de su doctora y no asistir con regularidad a la terapia física recomendada.

El tribunal *a quo* inexplicablemente ignoró la importante prueba documental antes mencionada y justifica la imposición de responsabilidad al doctor Segarra en el sólo hecho de que concedió *"mayor peso"* al testimonio vertido por la demandante, ignorando el peso evidenciario de las dos autorizaciones firmadas por la demandante y las anotaciones sobre las explicaciones de los riesgos que en distintas fechas se hicieron en el récord de oficina del doctor Segarra y en el récord de hospitalización de la demandante en el Hospital San Pablo. Al así proceder, el tribunal de instancia resolvió la controversia sobre el consentimiento informado en contravención a la preponderancia de la prueba presentada. Más aún, la decisión resulta contraria a derecho a la luz de lo resuelto por el Tribunal Supremo de Puerto Rico en *Rodríguez Crespo v. Hernández, supra.* Allí se presentó una situación de hechos prácticamente idéntica a la del caso de autos. El Tribunal Supremo hace énfasis en

que la paciente nunca objetó ni cuestionó el tratamiento que propuso el médico demandado, así como tampoco solicitó nformación adicional a la prestada por él. Igual a lo razonado por el Tribunal Supremo en el caso antes citado, aun si se aceptara para fines de argumentación que el doctor Segarra no le hubiera dado suficiente explicación sobre los riesgos a la demandante, cabe preguntarse por qué la demandante al leer ella los dos permisos o autorizaciones que firmó, no preguntó al médico cuáles eran esos riesgos que se mencionaban en los dos documentos. Al igual que en Rodríguez Crespo, *supra*, en el presente caso no surge de los autos que la paciente objetara firmar los documentos o que cuestionara en forma alguna el procedimiento quirúrgico sugerido o solicitara información adicional a la que le dio el médico. En Rodríguez Crespo, *supra*, el Tribunal Supremo consideró de primordial importancia el hecho de que la demandante había suscrito un consentimiento escrito en el cual admitía que se le había explicado la naturaleza y objeto de la operación, así como los riesgos envueltos y la posibilidad de complicaciones. El documento firmado por la demandante en Rodríguez Crespo, *supra*, aparece transcrito en la opinión del Tribunal Supremo, a la página 667, y el texto de dicho documento es prácticamente idéntico al texto de los dos documentos firmados por la Sra. Vachier Guzmán en este caso y que antes transcribimos en su parte pertinente. Al analizar la prueba en conjunto y las actuaciones de la apelada, lo declarado por ésta negando que se le informara de la parálisis facial no debe en justicia prevalecer sobre la preponderancia de la abundante prueba documental presentada que indica lo contrario. Es claro que el testimonio de la apelada fue uno evidentemente interesado y prejuiciado. Más aún, la teoría de falta de consentimiento fue traída por la parte apelada por primera vez durante el juicio al percatarse de que la causa de acción por negligencia no podía prosperar. Véase demanda y el informe de conferencia con antelación al juicio, págs. 1-3 y 6-11 del apéndice conjunto, respectivamente.

Como señaláramos anteriormente, los hechos presentados al juzgador en *Rodríguez Crespo v. Hernández, supra*, eran casi idénticos a los del caso de autos. Allí la demandante, a pesar de haber firmado un consentimiento operatorio cuyo texto hemos citado anteriormente, pretendió en el juicio negar que se le había provisto información suficiente sobre los riesgos envueltos. Después de señalar que la demandante nunca objetó ni cuestionó el tratamiento propuesto, así como tampoco había solicitado información adicional a la que le brindó el médico, y luego de enfatizar que la demandante había suscrito un documento en el cual se indicaba que los riesgos envueltos le habían sido ampliamente explicados, el Tribunal resolvió a favor del médico demandado expresando lo siguiente a la página 667:

*"No vemos cómo se puede sostener que la recurrente no prestó un consentimiento informado cuando ella cuenta con preparación académica, es la contable de la oficina de abogados que la representaron legalmente y admitió por escrito que se le había informado adecuadamente de todos los procedimientos que se llevarían a cabo sobre su persona, los métodos alternos y los riesgos envueltos. **Ello convierte en académico este aspecto de la controversia.**"* (Enfasis suplido.)

Lo resuelto en *Rodríguez Crespo v. Hernández, supra*, es enteramente aplicable a los hechos específicos del caso de autos y el tribunal de origen erró al imponer responsabilidad.

Finalmente, es preciso señalar que la doctrina mayoritaria requiere que un demandante que alega falta de consentimiento informado debe ofrecer testimonio pericial para establecer que: (1) un profesional médico razonable, siguiendo criterios prevalecientes en la práctica de la medicina y situado en circunstancias similares, hubiera informado sobre ese riesgo y (2) que el demandado no cumplió con ese criterio profesional prevaleciente en la profesión médica. *Sepúlveda de Arrieta v. Barreto, supra*, a la pág. 543. El requisito de presentar prueba pericial sigue siendo necesario aun en las jurisdicciones que diferente a la nuestra han adoptado el criterio de paciente razonable. *Id.* a las págs. 543 y 544.

Así lo reconoce el tribunal sentenciador a las páginas 16 y 19 de su sentencia. No obstante, la apelada no presentó prueba pericial para sostener la reclamación basada en falta de consentimiento y su prueba no estableció los requisitos necesarios señalados en *Sepúlveda de Arrieta v. Barreto, supra*. En ese aspecto, la determinación del tribunal de instancia sobre falta de consentimiento informado no encuentra apoyo en prueba pericial y es contraria a la preponderancia de la prueba desfilada y a la doctrina vigente. Por tanto, resolvemos y concluimos que no puede prevalecer.

En Puerto Rico rige la doctrina de la *"causalidad adecuada"* para determinar causalidad legal entre la acción u omisión negligente y el daño sufrido. Conforme a esta doctrina, no es causa toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general. A su amparo, la cuestión a resolver consiste en determinar si la materialización del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. *Sepúlveda de Arrieta v. Barreto, supra,* a la pág. 548; *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 D.P.R. 702, 710 (1990).

El Art. 1802 del Código Civil, 31 L.P.R.A. 5141, establece que todo perjuicio material o moral da lugar a reparación si concurren tres requisitos o elementos: primero, que se establezca la realidad del daño sufrido; segundo, que exista nexo causal entre el daño y la acción u omisión de otra persona; tercero, que dicho acto u omisión sea culposo o negligente. *Vélez Rodríguez v. Amaro Cora,* \_\_\_ D.P.R. \_\_\_ (1995), **95 J.T.S. 38**, 756; *J.A.D.M. v. Centro Comercial Plaza Carolina,* \_\_\_ D.P.R. \_\_\_ (1993), **93 J.T.S. 26**, pág. 10437; *Elba ABM v. U.P.R.,* 125 D.P.R. 294, 308 (1990 ).

Una omisión es antijurídica cuando el alegado causante del daño incumple un deber jurídico de actuar, y la realización del acto omitido hubiere evitado el daño.

Resolvemos y concluimos que el apelante, Dr. Segarra, cumplió con su deber jurídico de actuar al informar a la apelada los riesgos de la operación a que iba a ser sometida.

Por todo lo anteriormente expuesto, se revoca la sentencia apelada dictada el día 15 de marzo de 1996 por el Tribunal de Primera Instancia, Sala Superior de Bayamón.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

<div align="right">

Aida I. Oquendo Graulau
Secretaria General