Brau Ramírez, Juez Ponente
*1096 TEXTO COMPLETO DE LA SENTENCIA
I
Los apelantes, Eleanor Betancourt Rivera, Pedro Juan Ruíz Lebrón y la Sociedad Legal de Gananciales compuesta por ambos, recurren de una sentencia emitida el 3 de diciembre de 1997, por el Tribunal de Primera Instancia, Sala Superior de Guayama, en la demanda por daños y perjuicios por mala práctica de la medicina presentada por los apelantes contra la parte apelada, Dr. Fideas Naveo Medina y la Sociedad Legal de Gananciales compuesta por él y su esposa, el Hospital Santa Rosa, Inc., y las compañías aseguradoras de éstos, Seguros Triple "S" y el Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Médico-Hospitalaria ("S.I.M.E.D.").
Mediante el dictamen en cuestión, el Tribunal desestimó la demanda presentada por los apelantes al concluir, luego de la vista en su fondo del caso, que la parte apelada no había incurrido en actos constitutivos de impericia médica.
Confirmamos.
II
Según surge de los autos, los apelantes son casados entre sí y residentes en el Barrio Cacao del Municipio de Patillas, Puerto Rico. Para la fecha relevante a la presente controversia, la Sra. Betancourt se desempeñaba como empleada del Centro de Diagnóstico y Tratamiento del municipio de Arroyo, en la posición de técnica de servicios sociales del Programa de Asistencia Médica.
La controversia entre las partes se remonta a un accidente sufrido por la apelante, Sra. Eleanor Betancourt Rivera, el 18 de septiembre de 1992.
Ese día, entre 7:00 y 8:00 p.m., la Sra. Betancourt fue de visita a la casa de una amiga en Patillas en compañía de su familia. Mientras intentaba subir una escalera existente en la casa, perdió el balance. En esos momentos, la Sra. Betancourt llevaba a su hijo en sus brazos. Para evitar una caída se agarró del portón de entrada de la casa, el cual tenía un diseño punzante. La Sra. Betancourt sufrió una cortadura honda en el dedo índice de su mano izquierda. Además, se lastimó su tobillo izquierdo.
La Sra. Betancourt fue auxiliada por su esposo y por la amiga que habían ido a visitar. En vista de la magnitud de la herida, la cual sangraba, fue llevada a la Sala de Emergencias del Hospital Santa Rosa de Guayama, Puerto Rico. Allí fue atendida por el Dr. Fideas Naveo Medina, quien para esa época fungía como médico en la Sala de Emergencias de dicho Hospital.
El Dr. Fideas ordenó que se le tomaran radiografías del tobillo izquierdo y de la mano izquierda a la Sra. Betancourt. Las radiografías no revelaron fracturas ni en el tobillo ni en la mano.
El Dr. Naveo Medina examinó a la apelante. Le pidió que moviera el dedo herido, para verificar la extensión y flexión del dedo lacerado, lo cual ella hizo. Luego, procedió a limpiar la herida, y a tomarle 25 puntos de sutura, bajo condiciones estériles. El Dr. Fideas le dio un documento a la apelante con instrucciones sobre cómo cuidar la herida durante los próximos días. También le entregó una receta para antibióticos.
Al día siguiente, la apelante llamó al Hospital Santa Rosa para preguntar cuándo debía acudir para que le cortaran los puntos de sutura. Del Hospital le dijeron que no le podían dar esa información por teléfono, que debía acudir personalmente al hospital. La apelante no acudió al hospital, sino que consultó con uno de los médicos del C.D.T. en el que trabajaba, quien le indicó que los puntos debían ser cortados entre los diez días a dos semanas de haber sido tomados.
A los diez días de sufrir el accidente, el 28 de septiembre de 1992, la apelante le solicitó a un *1097 médico que laboraba en el C.D.T. de Arroyo, el Dr. Olivero, que le cortase los puntos de sutura. Mientras le cortaban los puntos la herida comenzó a sangrar profusamente.
Ante esa situación, y por recomendación del Dr. Olivero, la apelante acudió nuevamente al Hospital Santa Rosa. Allí fue atendida por el Dr. Roque Nido, quien se desempeñaba como cirujano en el área de Guayama. El Dr. Roque Nido procedió a limpiar la herida y a debridar los bordes de la misma, le colocó encima una cinta y le dio una cita de seguimiento para dentro de una semana. No le recetó antibióticos.
Durante la visita de seguimiento, el Dr. Roque Nido evaluó a la apelante, quien se quejaba de dolor en el dedo, y la refirió para que tomase terapias en su dedo índice izquierdo. La apelante acudió a "Concepto Físico" donde fue atendida por el Dr. Robert Santiago, especialista en fisioterapia. La apelante recibió aproximadamente de diez a doce terapias. No obstante, no mostró progreso con las terapias y continuó quejándose de que sentía un "dolor intolerable" en su dedo.
El Dr. Santiago refirió a la apelante a un cirujano de la mano, Dr. Jean Pierre Segarra, pero ella no acudió a él debido a que éste no aceptaba el plan médico de la apelante.
En su lugar, la apelante acudió al Dr. Tomás Torres Delgado, también cirujano de la mano. En el documento de referido suscrito por Dr. Santiago el 17 de noviembre de 1992, se explica que la paciente sufría de una contractura, esto es, que no podía estirar su dedo con normalidad, a lo largo de la articulación PIP ("PIP joint").
Según la prueba desfilada durante el juicio, una persona normal puede estirar su dedo completamente y doblar el mismo hasta noventa grados (90J). La apelante mostraba una deficiencia de cinco grados (5j) en el estiramiento de su dedo. Se quejaba, además, de que sufría de un agudo dolor ("excruciating pain") cuando flexionaba la articulación PIP de su dedo más allá de los ochenta grados (80/).
El Dr. Torres Delgado evaluó a la paciente y le manifestó que, según su opinión, ella tenía un nervio pinchado, pero que desconocía cuál era la condición del nervio. Le recomendó que se operara lo antes posible, sometiéndose a una Z-plastía, con el propósito de reconstruirle el nervio. La apelante asintió a la intervención.
El 2 de diciembre de 1992 la apelante fue ingresada al Hospital Metropolitano donde fue operada por el Dr. Torres Delgado. El récord de dicha intervención refleja que al abrir el dedo de la apelante, el Dr. Torres encontró la existencia de adhesiones próximas al nervio. El Dr. Torres también encontró que el nervio estaba afectado por daño de cicatrices ("cicatricial damage"), por lo que optó por remover parte del mismo (neuroctomía) para que la paciente pudiera obtener la extensión completa del dedo.
Luego de la operación la apelante volvió a recibir una serie de terapias con el Dr. Santiago, con lo que pudo corregir la deficiencia de cinco grados (5j) en su extensión. No obstante, toda vez que su nervio había sido cortado, la apelante quedó con una incapacidad permanente en su dedo índice izquierdo, viéndose incapacitada de flexionar el mismo más de cuarenta grados (40j).
En marzo del 1993 el Dr. Torres evaluó nuevamente a la apelante. Encontró que ella había desarrollado lo que se conoce como un dedo congelado ("frozen finger”). Esto quiere decir que el dedo ni doblaba ni estiraba bien; estaba estático. Concluyó que el dedo tenía adherencias en otros tendones y mostraba atrofia por la falta de uso. El Dr. Torres sugirió a la apelante someterse a un procedimiento de tenólisis, para librar el tendón de adherencias, pero en esta ocasión, la apelante no estuvo de acuerdo.
Poco después, los apelantes instaron la presente acción por daños y perjuicios contra los apelados. Alegaron que la incapacidad sobrevenida en el dedo de la Sra. Betancourt Rivera era atribuible a la impericia del Dr. Naveo quien había sido negligente al suturar la herida de la apelante, afectando su nervio. De igual modo reclamaron que el Hospital Santa Rosa era responsable al permitirle al Dr. Naveo Medina trabajar en dicho hospital sin tener dicho médico el entrenamiento necesario requerido *1098 por la buena práctica de la medicina. Los apelantes reclamaron daños ascendentes a $150,000.00.
Los demandados contestaron la demanda negando las alegaciones. Posteriormente, el Hospital Santa Rosa llegó a un acuerdo transaccional con la parte apelante en el cual los apelantes acordaron desistir de su reclamación en contra de dicha parte a cambio de un pago de $5,000.00. El caso continuó en cuanto al Dr. Naveo Medina.
Luego de otros incidentes, se celebró el juicio en su fondo los días 20 y 21 de agosto de 1997. Durante el mismo las partes presentaron pmeba testifical, documental y pericial.
Como primer testigo de la parte demandante declaró la Sra. Eleanor Betancourt Rivera. Esta declaró en tomo a los pormenores del accidente que había sufrido así como al tratamiento recibido de parte del Dr. Naveo Medina en la Sala de Emergencias del Hospital Santa Rosa y por los otros médicos que la habían tratado.
Declaró la apelante que antes de someterse a la operación que le hizo el Dr. Torres Delgado ella no podía doblar el dedo lesionado, que le dolía, y que luego de la intervención quirúrgica se sintió mejor y el dolor no era tan fuerte.
El juez de instancia examinó el dedo índice de la mano izquierda de la testigo y observó que era notable el hecho de que el dedo lesionado era más delgado que el dedo índice derecho de la apelante.
Durante el contrainterrogatorio la apelante declaró que era derecha, y que no se sentía incapacitada para hacer las labores diarias, aunque las hacía con mucha limitación.
Admitió la Sra. Betancourt Rivera que luego de realizarle la operación el Dr. Torres le ofreció la posibilidad de someterse a una tenólisis, pero que ella no estuvo de acuerdo. Admitió que aunque sintió dolor luego de ser atendida por el Dr. Naveo Medina no había regresado nuevamente al hospital, tal y como le instruía el documento que el Dr. Naveo le había entregado.
Como perito de ocurrencia de la parte apelante declaró el Dr. Torres Delgado, quien testificó sobre los detalles de su intervención con la paciente.
El Dr. Torres testificó que había atendido a la apelante por primera vez el 18 de noviembre de 1992. Ella presentaba una contractura en el dedo índice izquierdo que le mantenía el dedo en flexión. Opinó que la contracción del dedo de la apelante se debía a la mala cicatrización, lo cual era atribuible a que el dedo no había sido correctamente ^suturado.
El Dr. Torres explicó que la apelante había tenido una herida a todo lo largo del dedo mayormente tirando hacia el aspecto bolar o palmar. Dicha herida cruzaba los planos de los pliegues transversos al dedo. Cuando eso sucede, según el testigo, la herida debe suturarse en una forma en que se evite que la tensión de la cicatriz sea en contra de las líneas o pliegues del dedo. De no hacerse así, se provoca una contracción del dedo. Añadió que había que hacer una reparación de tal forma que las líneas de tensión fuesen a favor de los pliegues que tiene el dedo y no en contra; que fuesen paralelas y no transversas.
El perito indicó que el dedo de la apelante había cicatrizado en forma lineal y transversa cruzando los planos de los pliegues, lo que sugería que el tipo de sutura no había sido adecuado. Atestó que cuando examinó a la apelante el dedo estaba hipertrófico, o sea, que había cicatrizado más de lo normal. El dedo mostraba la contractura en la cicatriz original desde la base de la pared intraoxilar, que es el primer hueso del dedo, hasta el culper, o sea, que la cicatriz cruzaba el dedo a todo lo largo. Explicó que la hipertrofia se debió a que la herida cicatrizó en contra de los pliegues normales del tejido. Esto provocó un engrasamiento de la cicatriz, lo que a su vez contribuyó a la contractura.
El Dr. Torres Delgado indicó que en el lado ulnar del dedo el nervio digital estaba hipersensitivo, lo que era indicio de que había sido lacerado. Ante ese cuadro clínico él le recomendó a la apelante que se sometiese a cirugía.
*1099 El propósito de la operación era tratar de reparar el nervio, lo que no pudo hacerse debido a que había desarrollado un neuroma, (un tumor en el nervio). Le realizó también una Z-plastía, de modo que la tensión en los planos de la piel no fuese en contra de los pliegues del dedo, sino que fuese a favor, evitándose la contractura. Explicó que la cicatriz curó bien y que la refirió a fisioterapia para que le ayudase a estirar más el dedo.
El Dr. Torres también declaró sobre la evaluación que le realizó a la apelante en marzo del 1993. Declaró que le había explicado a la apelante que la única alternativa disponible era someterla a una tenólisis. Le indicó que no podía garantizarle que al someterse a la operación el dedo iba a quedar perfecto, por lo que la apelante decidió no operarse.
A preguntas del abogado de la parte apelante, el Dr. Torres Delgado declaró que era evidencia de que la herida había sido mal suturada el hecho de que cuando se cortaron los puntos de la herida ésta se había abierto de par en par. Atestó el Dr. Torres Delgado que si la herida se hubiese suturado borde con borde no se habría abierto. Indicó que sólo hay dos formas de que una herida reciente se abra; por infección o porque fue mal suturada. En este caso, el cirujano que inspeccionó la herida luego de cortados los puntos, Dr. Roque Nido, indicó que no había infección, por lo que debía concluirse que la sutura se había hecho mal.
Al señalársele que dentro de lo reglamentario no se contempla que un médico de Sala de Emergencias repare nervios ni realice Z-plastías, el Dr. Torres Delgado opinó que era deber de ese médico reconocer cuándo había un tendón o nervio partido, informárselo al paciente y referirlo a un especialista.
A preguntas de la representación legal de la parte apelada el Dr. Torres Delgado declaró que durante la operación se vio obligado a sacrificar el nervio del dedo, pero que esto no significaba que lo había sacado. Indicó que lo que hizo fue sacar el tejido cicatricial que se interponía entre los dos terminales del nervio.
Admitió que si la paciente hubiera tenido una infección en la herida, no importa quién la hubiese suturado, y aun realizándole una Z-plastía, los puntos se habrían abierto.
Durante el re-directo se le preguntó si de los expedientes médicos de la apelante surgía que ésta tuviese una infección en la herida, a lo cual él contestó que no. También explicó que las probabilidades de éxito de la tenólisis es de aproximadamente un cincuenta porciento (50%).
Por su parte, el apelado Dr. Fideas Naveo Medina declaró que era médico emergenciólogo, que trabajaba en el Hospital Santa Rosa haciendo tumos de guardia en la Sala de Emergencias. Declaró que se especializó en emergenciología en Puerto Rico desde el 1970.
Atestó que no recordaba los detalles de su tratamiento a la apelante del 18 de septiembre de 1992, pero que podía identificar como suya la firma que aparecía en el récord de la Sala de Emergencias del Hospital Santa Rosa para dicha paciente.
Durante el contrainterrogatorio declaró que no es parte de la rutina de la Sala de Emergencias llamar a un cirujano para que atienda heridas en las manos. Se le preguntó si la herida en el dedo de la apelante era profunda y él contestó que no. Al cuestionársele cómo podía afirmar que la herida no era muy profunda si él afirmó no tener recuerdos sobre el incidente y tampoco surgía tal hecho del récord médico, contestó que lo sabía por su experiencia como médico.
Cuando se le preguntó al Dr. Naveo Medina si instruyó a la apelante sobre cuándo debía acudir al hospital para que le cortaran los puntos de sutura contestó que sí lo hizo. Al plantearle el abogado de la parte apelante que tal instrucción no constaba en el expediente médico el Dr. Naveo Medina indicó que no era necesario hacerlo constar.
Como perito de la parte apelada testificó el Dr. Manuel A. Medina Hernández, cirujano de la mano. Declaró que preparó un informe pericial sobre la condición de la apelante utilizando como fuentes los récords hospitalarios, récords médicos e informes de operación y de patología, entre otros. Además, *1100 evaluó personalmente a la apelante, llegando a hacerle pruebas de fuerza con un dinamómetro. Estas pruebas de fuerza indicaron unos resultados normales en ambas manos, lo que significaba que la apelante no estaba fingiendo, sino que había cooperado con su evaluación.
A preguntas de la parte apelada declaró que las únicas razones por las que una herida, luego de suturada, se puede abrir es porque los bordes estén muertos y no hayan pegado, porque haya habido una infección o porque sufra un trauma posterior. Añadió que en este caso no había evidencia de un trauma posterior y que opinaba que la apelante había sufrido una infección, la que le había ocasionado la condición que el Dr. Torres había observado.
El Dr. Medina observó que, según los récords de la apelante, el Dr. Roque Nido había tenido que debridar la herida, esto es, había tenido que remover los bordes de la misma, porque el tejido estaba muerto, lo que implicaba la existencia de una infección.
Manifestó el testigo que no importaba cuánto se limpiase una herida no iba a ser posible eliminar j todas las bacterias que había y que siempre existía el riesgo de infección. Señaló que en el tres porciento (3%) de las operaciones limpias surgía una infección.
Al preguntársele si el modo en que una herida sea suturada tiene que ver con el hecho que luego esa herida se abra el Dr. Medina contestó que no. Afirmó que lo que determina que una herida cierre es que los bordes de la misma estén sanos. Una herida, expresó, "se puede aproximar con 'tape', o se puede aproximar con "crazy glue" o se puede aproximar con lo que sea, o inclusive, más aproximado una encima de otra; si tiene unos bordes saludables la herida va a sanar, fea pero, sana, no se va a abrir después de diez (10) días."
Expresó que no era necesario que el Dr. Roque Nido le suministrara antibióticos a la apelante, pues en ese momento la herida estaba abierta y expuesta al oxígeno y no había evidencia de celulitis.
El perito también declaró en tomo a la intervención del Dr. Torres Delgado. Observó que el consentimiento prestado por la apelante era para que el Dr. Torres le reparara una cicatriz en el dedo índice izquierdo, le eliminara la contractura y liberara el nervio. Señaló que, según el Informe de la operación, el Dr. Torres Delgado no sólo había efectuado esto ("Z-plastía"), sino que también había realizado una neuroctomía (remoción del nervio) a la apelante, la cual él opinó que no era necesaria.
El Dr. Medina Señaló que no surgía de ninguno de los récords médicos por él examinados que el nervio del dedo índice izquierdo de la apelante haya sufrido alguna laceración. De hecho, antes de ser operada, tenía un arco de movimiento de menos cinco grados (5j) a más de ochenta grados (80J). Esto significa que no podía enderezar (extender) el dedo completamente y que cuando intentaba doblar (flexionar) el dedo más allá de ochenta grados (80j) sentía dolor.
Luego de la operación la apelante podía extender el dedo completamente, lo cual es indicio de mejoría, pero no podía flexionarlo a más de cuarenta grados (40j) supuestamente porque perdió sensibilidad al cortársele el nervio.
Expresó que no se podía responsabilizar al Dr. Naveo Medina por la incapacidad de la apelante debido a que antes de la intervención del Dr. Torres ella tenía mayor flexión en su dedo de la que tiene ahora. Ella tenía una extensión casi completa, con un déficit de sólo cinco grados (5j), por lo que no era necesario siquiera hacerle una Z-plastía.
Declaró que aunque originalmente la herida hubiese sido cosida con una Z-plastía la misma se habría abierto.
Durante el contrainterrogatorio el Dr. Medina se reafirmó en que no importa cómo hubiese sido suturada la herida de la apelante la misma estaba predispuesta a abrirse, toda vez que ello fue producto de una infección.
Observó que al igual que en una tortilla española, la parte superior de la piel, la epidermis, es dura, porque se compone de células muertas. Un tejido muerto no vive y si lo cortamos no vuelve y pega. *1101 Cuando hay una herida, la capa superior se corta y despelleja. Es la parte de abajo de la tortilla, la dermis, que es la papa, la parte que es activa y de la cual se depende para que la herida cierre. ”[N]o importa como yo pegue eso, o lo pegue así, o lo pegue así, o lo pegue de lado, o lo pegue con 'tape', si la papa también está muerta, no importa cómo yo pegué esa papa, esa tortilla se va a abrir. Si esa papa está viva, no importa cómo yo la pegue va a crecer papa de un lado hacia otro, se va a ver feo, pero esa herida no se va a abrir."
Admitió el testigo que no sabía cuán profunda o complicada era la herida sufrida por la apelante. Atestó que él no creía que el nervio del dedo índice izquierdo hubiese sido lacerado. Al confrontársele con el Informe Operatorio que señalaba la presencia de adherencias, el Dr. Medina indica que eso era un indicio más de la presencia de una infección, pero no de que hubiera un nervio lacerado.
El Dr. Medina Señaló que había varios elementos en el expediente médico de la paciente que indicaban que había ocurrido una infección o inflamación. En primer lugar, estaba el hecho de que la paciente sangró cuando le quitaron los puntos. Según explicara el Dr. Medina, a menos que una persona tenga un problema de coagulación, no sangra cuando sanan dichas heridas, lo que bota es una "saguaza", compuesta de células rojas y blancas muertas y de células epiteliares muertas. La segunda prueba de la infección, es que el Dr. Roque Nido tuvo que debridar la herida, esto es, remover el tejido muerto. En tercer lugar, las adherencias a nivel del nervio.
Según el testigo, las adherencias son indicativas de muerte celular. Al morir las células, salen proteínas, las cuales, según la descripción del testigo "son como la clara del huevo, cuando están líquidas no hay problema, una vez que se calienta, se fríe y se pone duro se empiezan a crearse, se ponen duros y empiezan a crear adherencias y estas adherencias aquí encima en el nervio, y que el doctor describe, le deja saber a uno que aquí hubo un proceso.. de infección, el cual al hacer presión mata esta sección de células vivas que hay aquí, que fue lo que salió como saguaza cuando le quitaron los puntos y como esto está muerto, esto no pega con esto y la herida termina abriéndose en esa forma...".
Luego de recibir toda la prueba testifical, pericial y documental el Tribunal de Primera Instancia dictó sentencia desestimando la demanda. En su sentencia el Tribunal concluyó que el apelado, Dr. Fideas Naveo Medina, brindó a la apelante un tratamiento médico adecuado conforme a la mejor práctica de la medicina. El Tribunal de instancia le concedió entera credibilidad a la opinión del perito de la parte apelada, concluyendo que los daños de la apelante se habían debido a un proceso de infección y no a la negligencia del Dr. Naveo. Invocando los fundamentos utilizados por el Dr. Medina, el Tribunal expresó:

"[Ejxiste suficiente evidencia en los récords médicos que previamente fueron estipulados por las partes, que la herida de la paciente se infectó. Cuando se removieron las suturas de la herida de la Sra. Betancourt, ésta se abrió y comenzó a sangrar, y a menos que la paciente tenga problemas de coagulación, las heridas que se abren no sangran, lo que botan es una "saguaza" (mezcla de células rojas muertas, células blancas y células epiteliares muertas). La segunda evidencia de infección es la debridación de la herida que hizo el Dr. Roque Nido y la tercera surge del récord médico del Dr. Torres Delgado, donde se establece que la paciente presentaba adherencias a nivel del nervio."

Más adelante, el Tribunal también expresó:

"El testimonio del Dr. Medina, al cual le hemos dado entero crédito, fue a los efectos que la herida de la Sra. Eleanor Betancourt se infectó, lo que causó que la misma se abriera. El testimonio del Dr. Medina fue claro y conciso a los efectos de que toda herida corre el riesgo de infectarse. No importa cuánto se haya limpiado la misma, no se pueden eliminar todas las bacterias que existen en esa herida, y siempre se corre el riesgo de que se infecte. Tanto es así, que en una operación limpia el tres porciento (3%) de estos casos se infectan y esto está aceptado en la mejor práctica de la medicina. No se demostró ante este Tribunal que las actuaciones del Dr. Fideas Naveo Medina fue lo que causó los daños alegados en la demanda."

Inconformes con este dictamen, los apelantes recurrieron ante este Tribunal.
*1102 III
En su recurso, los apelantes cuestionan la aquilatación de la prueba llevada a cabo por el Tribunal de Primera Instancia y plantean que la Sala sentenciadora erró al declarar sin lugar la demanda existiendo pmeba preponderante relativa a la negligencia del apelado.
En nuestra jurisdicción, según se conoce, la responsabilidad civil derivada de actos u omisiones culposas o negligentes se rige por lo dispuesto en el Art. 1802 de nuestro Código Civil. 31 L.P.R.A., sec 5141. Véase, Toro Aponte v. Estado Libre Asociado de Puerto Rico, _ D.P.R. _ (1997), 97 J.T.S. 18, a la pág. 627.
Para que exista responsabilidad civil bajo el citado artículo es necesario que concurran los siguientes elementos: un daño, una acción u omisión negligente y la correspondiente relación causal entre el daño y la conducta culposa o negligente. Id., a la pág. 627; Ramírez Salcedo v. Estado Libre Asociado de Puerto Rico, _ D.P.R. _ (1996), 96 J.T.S. 41, a la pág. 866; Tormos Arroyo v. Departamento de Instrucción Pública del E.L.A. de P.R., _ D.P.R. _ (1996), 96 J.T.S. 34, a la pág. 806.
La culpa o negligencia es la falta del debido cuidado, que a su vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. Toro Aponte v. Estado Libre Asociado de Puerto Rico, 97 J.T.S. 18, a la pág. 627.
Para determinar si una omisión genera responsabilidad se consideran los siguientes elementos: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) si de haberse realizado el acto omitido se hubiera evitado el daño. Toro Aponte v. Estado Libre Asociado de Puerto Rico, Id., a la pág. 627; Tormos Arroyo v. Departamento de Instrucción Pública del E.L.A. de P.R., 96 J.T.S. 34, a la pág. 806.
La norma de cuidado médico exigible al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es aquella que, a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de la ciencia y práctica prevaleciente de la medicina satisface las exigencias generalmente reconocidas por la profesión médica. Castro Ortiz v. Municipio de Carolina, _ D.P.R. _ (1994), 94 J.T.S. 17, a la pág. 11,529; Oliveros v. Abreu, 101 D.P.R. 209, 226 (1973).
De ordinario, lo que constituye o no una práctica profesional adecuada en un caso de impericia médica debe ser establecido mediante testimonio pericial. Véanse, Santiago Otero v. Méndez, _ D.P.R. _(1994), 94 J.T.S. 38, a la pág. 11,709; Ríos Ruiz v. Mark, 119 D.P.R. 816, 828-829 (1987); Reyes v. Phoenix Assurance Co., 100 D.P.R. 871, 877 (1972); Guzmán v. Silén, 86 D.P.R. 532, 538 (1962). No corresponde a los tribunales prescribir tratamientos médicos. Véanse, Ríos Ruiz v. Mark, 119 D.P.R., a la pág. 821; Cruz v. Centro Médico de P.R., 113 D.P.R. 719, 736 (1983).
Para establecer un caso prima facie contra un médico la parte demandante viene obligada a (1) presentar prueba sobre las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o especialistas, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente y (3) que esto fue la causa del daño sufrido por el paciente. Véanse, Blás Toledo v. Hospital Nuestra señora de la Guadalupe, _ D.P.R. _ (1998), 98 J.T.S. 101, n. 54, a la pág. 1452; Santiago Otero v. Méndez, 94 J.T.S. 39, a la pág. 11,712; Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 650 (1988); Medina Santiago v. Vélez, 120 D.P.R. 380, 385 (1988); Matos v. Adm. Serv. Médicos de P.R., 118 D.P.R. 567, 569 (1987).
Existe una presunción de que el médico ha observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente han sido adecuados. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito es insuficiente, de por sí, para derrotar dicha presunción. Corresponde a la parte demandante controvertir la misma con prueba que demuestre algo más que la mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. La relación de causalidad no puede establecerse a base de meras especulaciones o conjeturas sino que, al igual que en todo caso civil, por preponderancia de la prueba. Si la evidencia señala a la existencia de múltiples causas del daño no puede imponérsele responsabilidad al médico a menos que del conjunto de la evidencia surja *1103 que con mayor probabilidad la actuación negligente fue la causa del daño. Ramos Robles v. García Vicario, _ D.P.R. _ (1993), 93 J.T.S. 167, a la pág. 11,397; Viuda de López v. E.L.A., 104 D.P.R. 178, 183 (1975).
En la situación de autos, el Tribunal de Primera Instancia concluyó que el daño sufrido por la apelante no se había debido a negligencia alguna por parte del Dr. Naveo, sino que el mismo era más bien atribuible a que la herida de la apelante había sufrido un proceso de infección y/o inflamación en el dedo de la apelante, el cual era riesgo inherente a su condición que no era posible evitar. Hemos examinado el récord y no tenemos base para sustituir el juicio de la ilustrada Sala de instancia.
Lo cierto es que, según señalara el Tribunal, la opinión del Dr. Medina, perito de la parte apelada, aparece respaldada por varios hallazgos objetivos del récord de la apelante, que apuntan a la existencia de un proceso de infección. En particular, la hemorragia al cortar los puntos de sutura, y la correspondiente necesidad de debridar los bordes de la herida, así como la existencia de adherencias en el interior del dedo de la apelante, tienden a respaldar la opinión del perito de la parte apelada de que la apelante sufrió un proceso de inflamación y/o infección. No podemos, en vista de ello, concluir que la determinación del Tribunal, que atribuyó a dicho factor el dolor desarrollado por la apelante en su dedo, fuese claramente errónea.
También entendemos razonable la determinación del Tribunal de que dicha infección no es atribuible a la negligencia del apelado. Según el testimonio del perito de dicha parte, la infección de heridas es un riesgo inherente que ocurre en un tres porciento (3%) de los casos, no importa las precauciones que se tomen. En la presente situación, la sutura de la herida de la apelante fue llevada a cabo bajo condiciones estériles. El Dr. Naveo también recetó antibióticos a la apelante y le instruyó que en caso de cualquier complicación, ésta debería regresar al hospital, instrucción, cabe añadir, que no fue seguida por ésta.
La parte apelante plantea que el nervio del dedo de la apelante fue originalmente afectado por su cortadura y que la negligencia del apelado consistió en no reconocer dicha situación y referirla a un especialista. La evidencia sobre este particular, sin embargo, es un tanto ambigua. Aunque las notas de operación del Dr. Torres reflejan que éste halló adherencias y tejido de cicatriz, lo que lo llevó a remover parte del nervio, las pruebas objetivas reflejan que la apelante tenía un grado relativamente alto de movilidad en su dedo antes de la operación del Dr. Torres, y que su déficit en el movimiento de extensión era de sólo cinco grados (5j). La queja mayor de la apelante en este momento era de un gran dolor en el dedo, lo que no resulta inconsistente con la opinión del Dr. Medina de que dicha condición era atribuible a una infección o inflamación.
Según se conoce, la norma en nuestra jurisdicción es que las apreciaciones y determinaciones de hechos que haga un tribunal de instancia merecen gran deferencia por parte del tribunal apelativo y no serán descartadas en ausencia de error manifiesto, pasión, prejuicio o parcialidad. Sepúlveda Rivas v. Departamento de Salud, _ D.P.R. _ (1998), 98 J.T.S. 59, a la pág. 949; Monllor Arzola v. Sociedad Legal de Gananciales, _ D.P.R. _ (1998), 98 J.T.S. 77, a la pág. 963. Garriga v. Condominio Marbella del Caribe Oeste, _ D.P.R. _ (1997), 97 J.T.S. 129, n. 2, a la pág.131; Méndez de Rodríguez v. Morales Molina, _ D.P.R. _ (1996), 96 J.T.S. 149, a la pág. 347; Levy v. Autoridad de Edificios Públicos, _ D.P.R. _ (1994), 94 J.T.S. 32, a la pág. 11,632.
El fundamento de esta deferencia hacia el tribunal de instancia es que el juez inferior tuvo la oportunidad de observar toda,la prueba presentada y, por lo tanto, se encuentra en mejor situación que el tribunal apelativo para considerarla. Sepúlveda Rivas v. Departamento de Salud, 98 J.T.S. 59, a la pág. 949.
En la situación de autos, entendemos que la decisión del Tribunal de Primera Instancia está adecuadamente sostenida por el récord. En estas circunstancias, procede su confirmación.
Por lós fundamentos expresados se confirma la sentencia apelada.
Lo pronunció el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General